JAMES WLASCHIN, APPELLANT, V. MARIE AFFLECK, APPELLEE.

93 N. W. 2d 186

Filed November 28, 1958. No. 34447.

*McGinley, Lane, Powers & McGinley,* for appellant.

*Firmin Q. Feltz* and *W. I. Tillinghast,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiff, James Wlaschin, brought this action at law against defendant, Marie Affleck, seeking to recover the fair and reasonable value of certain work, labor, and materials allegedly performed and supplied by plaintiff to defendant at her request for the improvement of a house and described lot in Keith County, or in the al-

ternative to recover the enhanced value of said property caused by such improvements. Exhibit A, an itemized statement of work, labor, and materials so furnished and supplied, was attached to and made part of plaintiff's amended petition.

For answer and cross-petition, defendant denied generally and alleged that on March 17, 1955, the parties inspected a house which was for sale but required removal from the owner's premises; that at that time, defendant offered to purchase the house and move it onto Lot 14, Affleck's Subdivision, and furnish certain described material for such house; that defendant offered to sell said house and lot to plaintiff for $4,500, provided plaintiff would perform all the labor of installing said material and constructing a foundation for such house; and that plaintiff agreed to do all the labor of installation and to purchase the house and lot on contract for $4,500, payable $49.96 on the first day of each month for the next 10 years, which included interest at six percent. Defendant then alleged that such a contract was executed by her and her husband on May 9, 1955, but upon notification thereof, plaintiff failed, refused, and neglected to sign it, although he moved into said house pursuant thereto on June 4, 1955, and thereafter made a $50 payment thereon, and continued to reside on said premises until August 13, 1955, when he voluntarily abandoned the contract and all rights thereunder, and vacated the premises. Defendant also alleged that all labor was performed and material was placed on the premises by plaintiff voluntarily, without consultation with defendant and without any express or implied agreement by defendant to pay for same, but were done pursuant to his oral agreement of March 17, 1955, to purchase the property; that about July 3, 1955, plaintiff made known to defendant that he was not going to execute the contract because he objected to paying interest on the purchase price; and that thereupon plaintiff wrongfully and unlawfully rescinded the

contract, but notwithstanding such fact he remained in possession of the premises and continued to expend labor and material thereon until July 25, 1955. Defendant then denied that the labor and material placed on the premises by plaintiff had enhanced the value thereof because such labor and material were not installed in a workmanlike manner. Thereafter, defendant prayed for dismissal of plaintiff's amended petition, and after alleging that $50 was a reasonable monthly rental value of the premises, and after giving plaintiff credit for $50 paid on the contract in June, defendant sought a judgment against plaintiff for $100 as rental of the premises for July and August 1955.

For reply and answer, plaintiff denied generally except as thereinafter admitted. He then alleged that sometime prior to April 1, 1955, he discussed purchase of the house and removal of same by defendant to the lot involved; that at or about that time, defendant represented to plaintiff that she would move said house, furnish all material and fixtures therefor, and sell the house and lot to plaintiff for $4,500 without interest, payable $50 each month, if plaintiff would perform all labor in connection with installations in said house, and the improvement and alteration thereof; and that relying on defendant's said false representations, plaintiff performed all work and labor and furnished all material which defendant failed to supply, as described in his amended petition. Plaintiff then renewed his prayer for recovery of damages from defendant; alleged that in June he had paid $50 to defendant, believing that it was the first payment on the contract, which defendant had falsely and fraudulently entered into with plaintiff; and prayed for dismissal of defendant's cross-petition.

After a hearing before a jury whereat voluminous evidence was adduced by plaintiff, defendant moved for directed verdict on the grounds that the evidence on plaintiff's theory of express or implied contract was insufficient to sustain a verdict in favor of plaintiff, and

that, as a matter of law, plaintiff could not recover from defendant upon a theory of enhanced value of the premises. Thereupon, defendant's motion was sustained, and judgment was rendered which dismissed plaintiff's action, dismissed defendant's cross-petition, and taxed all costs to plaintiff. Thereafter, plaintiff's motion for new trial was overruled, and he appealed, assigning that the trial court erred in sustaining defendant's motion for directed verdict and in overruling plaintiff's motion for new trial. We sustain the assignments.

It is elementary that: "A motion for directed verdict * * * must, for the purpose of decision thereon, be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor, and to have the benefit of every inference that can reasonably be deduced from the evidence." Edgar v. Omaha Public Power Dist., 166 Neb. 452, 89 N. W. 2d 238.

It is also well known that: "If there is any evidence which will sustain a finding for the litigant having the burden of proof in a cause the trial court may not disregard it and decide the case as a matter of law." Long v. Whalen, 160 Neb. 813, 71 N. W. 2d 496.

Viewed in such light, we summarize the material and relevant evidence from which a jury could have reasonably concluded the following: Plaintiff and his wife Emily lived with their three children in a very crowded basement apartment in Ogallala. Both parents had regular employment. Defendant's husband, Bill Affleck, was the father of plaintiff's wife. Defendant was a welfare worker. She owned several lots in Affleck's Subdivision, including Lot 14 here involved. Most of such lots had been purchased by defendant from the county.

On or about March 15, 1955, plaintiff and his wife, together with her father and defendant, drove to Grant to look at a farm house which was for sale but had to

be removed from its location. A few days later the parties discussed the terms of a possible purchase of the house and Lot 14 by plaintiff after the house had been purchased and moved to said lot by defendant. There and then it was orally proposed and agreed that defendant would purchase the house and have same moved to Lot 14 and furnish the material necessary to improve, remodel, and make a livable house for plaintiff and his family if plaintiff would do and have done all the labor necessary to so improve the property as a down payment, and defendant would sell plaintiff the house and lot for $4,500 without interest, said balance to be paid for by plaintiff at the rate of $50 each month.

The lot was then vacant and staked out according to the records. It was covered with weeds, and, after cleaning off the lot, plaintiff, with the help of his father and several other named employees who worked mornings, evenings, and Sundays, began building forms, digging trenches, and mixing and pouring concrete for the foundation, measurements for which had been previously made on the house with Bill Affleck's steel tape and in his presence. A cesspool, 6 x 8 x 8 feet was also dug and installed by plaintiff, and the house was moved upon the lot by defendant about May 12, 1955. It was later set down on the foundation.

At that time, the kitchen was not in good condition. Moving had cracked the ceiling plaster, requiring its removal. There was only one small window in the room. The insulation between the side walls consisted of mud and packed dirt, so the plaster had to be removed from the walls and replaced with plaster board furnished by defendant. It was also necessary to cut a window in one of the walls wherein a set of double windows was installed on the south side with another window in the west end of the kitchen. Defendant and her husband furnished the windows. They were present when that work was being done, and made no protest then or at other times. The fact is that they commented in the

presence of another workman that the house looked nice and that plaintiff was doing a good job. As a matter of fact, Bill Affleck was present and voluntarily assisted in doing some of the works of improvement.

When the house was moved in, there was only one kitchen cabinet. It hung on the wall and was replaced by a work bench with cabinets on top of it. They were made by plaintiff's father, an experienced carpenter. There was no sink in the kitchen. An archway to replace a door was cut between the kitchen and the living room. The electric wiring was changed around and wall plugs were installed. Defendant provided a used kitchen sink in fair condition, and it was installed. There was a cracked brick chimney in the living room. It actually hung from braces on the wall, about 4 feet above the floor, and went up to the second story. It was in bad condition and unsafe to use, so plaintiff took it out and replaced it with a metal-bestos steel chimney furnished by defendant.

There was no bathroom in the house, so plaintiff constructed one by extending the wall of the back porch which adjoined the kitchen, thereby adding 4 more feet of room in order to have a bathroom and utility room. This was done by taking out and moving the back wall of the porch, setting the porch on a foundation, building the roof on out to the extension, pouring a concrete floor, and building a frame for the door. The lumber for that and some other work was taken from a scrap pile located south of the house or from pieces of old lumber taken from the house itself.

There was no city water available, so plaintiff dug a hole for a well down to water, installed the casing therein, and connected thereto a water pump furnished by defendant. Plaintiff, his wife, and his father also painted the outside window casings, the frames, and mopboards with paint furnished by plaintiff. Plaintiff also provided the tile and employed his brother, who was engaged in that business, to lay the tile in the kitchen.

He also fitted the kitchen sink and covered the bench board with linoleum. The plumbing work was done by plaintiff and his father. Further, a foundation was put under the front porch, but such porch was not yet completed when plaintiff left the house.

In order to connect up the gas, it was necessary for plaintiff to dig a trench from the house to the gas company's main pipe in the alley, and lay a pipe furnished by defendant from the alley to the house, then hook up the gas to the hot water heater and hook up the water to the hot water heater, the bathroom tub, other facilities, and stool, all furnished by defendant. However, plaintiff furnished the necessary copper tubing and brass fittings.

During remodeling, much time was spent hauling out debris and cleaning up the house to fit it for occupancy. Plaintiff and his family moved into the house in June before it was entirely ready for occupancy, but they did so because their apartment was very small, and they assumed that the oral agreement theretofore made would be carried out by defendant.

In that connection, defendant had asked plaintiff two or three times to go up to her lawyer's office and sign the written contract, but plaintiff was employed during the day elsewhere and was working on the house early every morning, late evenings, and Sundays, because of the immediate urgent need for a place to live. As a consequence, he and his wife did not go up to sign the written contract or inspect it until about July 3, 1955. However, prior thereto and before they had seen the written contract, plaintiff had paid defendant $50, believing that it was the first payment on the contract. Upon seeing the contract, plaintiff and his wife then discovered that the written contract, dated June __, 1955, and appearing in this record, did not incorporate the terms previously orally agreed upon. Rather, the written contract provided that the purchase price was $4,600 instead of $4,500, and that the $4,600 was made

payable at the rate of $51.07 on July 1, 1955, and the first day of each month thereafter for the next 10 years. Nothing was directly said in the written contract about interest, but it was made mathematically and otherwise certain that it included interest, despite the fact that the purchase price was previously agreed to be $4,500, payable $50 a month without interest. In other words, instead of paying $4,500, plaintiff would be required to pay $6,128.40.

In that situation, plaintiff and his wife did not sign the contract then or thereafter, but went and talked to defendant about it in the presence of defendant's husband. Upon inquiring of defendant why she had charged interest, she replied that she did not loan money without interest, and if they didn't like it they could just move out. Plaintiff's wife trusted her father, and because of their family relationship, plaintiff and his wife thought it would be possible to come to an agreement, so they continued to reside in the house and do some work thereon, but no agreement was ever reached. Thus, just before moving out on August 13, 1955, defendant's husband informed plaintiff and his wife that no agreement could be reached and ordered them to move out. Contrary to defendant's contention, we find no evidence which would justify a conclusion that plaintiff voluntarily made the improvements or abandoned his rights under the oral contract.

Oral evidence adduced by plaintiff was that he supplied material for the house of the fair and reasonable value of $166.32, and five exhibits received in evidence support that amount either charged to or paid for by plaintiff. Evidence adduced in plaintiff's behalf, by him, his wife, and several of his employees, was that the foregoing work and labor were performed; that the improvements were made on the house and lot as aforesaid; and that the fair and reasonable value of such work and labor was $1,400.

In that connection, there was also evidence adduced

in plaintiff's behalf by one witness who testified that before any work was done on the house and lot, the reasonable market value thereof was $1,000, and after the work was completed, it was so worth $4,000 to $4,500. Three other witnesses testified with regard to such values, and fixed them respectively as: $1,400 and $4,500; $950 to $1,000 and $4,500; and $800 and $4,500.

We are confronted then with the question of what amount if any plaintiff should recover from defendant. In that connection, plaintiff did not come within the provisions of Chapter 76, article 3, R. R. S. 1943, as an occupying claimant (Williams v. Beckmark, 146 Neb. 814, 21 N. W. 2d 745), but nevertheless, under the circumstances presented herein, his measure of recovery if any should be determined as hereinafter indicated.

In Schultz v. Thompson, 156 Minn. 357, 194 N. W. 884, a case almost identical with that at bar, the court said: "It is well settled that where a vendee under and in reliance upon an oral contract to purchase makes valuable improvements on the property and the vendor refuses to carry out the oral contract, the vendee may recover for such improvements to the extent that they enhanced the value of the property. (Citing authorities.) We need not stop to inquire whether the contract, unenforceable because not in writing, is sufficiently definite and certain to be specifically enforced if it had been in writing. The right of the vendee to recover for improvements made in good faith in reliance on an oral contract which fails through no fault of his, does not rest on the contract or any right to enforce it, but rests on the ground that the vendor, through whose fault the contract failed, ought not to obtain the enhanced value given to his property by the money and labor of the vendee without making compensation therefor. * * * Defendant urges that plaintiff did not show a tender of performance on his part. After defendant had refused to make the written contract unless made subject to the deed to the hunting club, and for an increased

rate of interest on the deferred payments, a further tender of performance by plaintiff was unnecessary."

In that case, the court specifically held: "Where a vendee, under and in reliance upon an oral contract to purchase, makes valuable improvements on the property, and the vendor refuses to carry out the contract, the vendee may recover for such improvements to the extent that they enhanced the value of the property.

"The right to recover for such improvements is based on the ground that the vendor, through whose fault the contract failed, ought not to obtain the enhanced value given to his property by the money and labor of the vendee· without making compensation therefor.

"After defendant refused to perform, tender of further performance by plaintiff was unnecessary."

Such rules were reaffirmed as recently as Tompkins v. Sandeen, 243 Minn. 256, 67 N. W. 2d 405, 49 A. L. R. 2d 1162, a materially comparable case citing numerous authorities, wherein the court said: "Consequently we conclude that the rules to be applied in this case must necessarily be the same as control situations where the purchaser, unable to compel specific performance because the contract is within the statute of frauds or too indefinite in its terms, seeks to recover for the improvements made in reliance upon the contract. There is no doubt that the purchaser can have such a recovery, which should properly be measured by the enhanced value of the land at the time possession is surrendered and not by the cost of the improvements.

"However, in this type of action this court, as well as others, has allowed the vendor to set off the reasonable value of the use and occupation of the premises by the purchaser against the value of improvements. The theory permitting the purchaser to recover for improvements does not rest on the contract but rather on the principle that the defaulting vendor ought not to be unjustly enriched."

Thereafter, the court cited and quoted with approval

from Schultz v. Thompson, *supra,* and said: "While some courts do not specifically characterize the action as one for 'unjust enrichment' or 'quasi contract' as this court has done, it is clear that the basis of most of the decisions rests on the same principle. It is well settled that under the unjust enrichment theory the parties are to be restored to the status quo as far as practicable, which necessarily involves the return of any benefits received by the plaintiff. Thus, while rescission of the contract is not involved, the result is substantially the same as if the plaintiff had elected to rescind. We conclude that defendant is entitled to set off the reasonable value of plaintiff's use and occupation of the premises from the inception of her occupancy.

"The reasonable rental value found by the trial court was apparently based on the use of the premises as improved. The proper measure of the setoff should be the value of the use and occupation of the premises *without the improvements* contributed by the plaintiff." The foregoing rules are controlling in the case at bar.

We conclude that the evidence adduced by plaintiff was amply sufficient to sustain a verdict for plaintiff, and that the trial court erred in directing a verdict for defendant and overruling plaintiff's motion for new trial. Therefore, the judgment of the trial court should be and hereby is reversed and the cause is remanded for further proceedings in conformity with this opinion.

REVERSED AND REMANDED.