ROGER EDGAR, APPELLANT, V. OMAHA PUBLIC POWER DISTRICT, A CORPORATION, APPELLEE.

89 N. W. 2d 238

Filed April 18, 1958. No. 34306.

*Gaines, Spittler & Moore,* for appellant.

*Fraser, Crofoot, Wenstrand, Stryker & Marshall,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiff, Roger Edgar, brought this action against defendant, Omaha Public Power District, seeking to recover damages for alleged false arrest and imprisonment. As far as important here, defendant's answer was a general denial. Upon trial to a jury, defendant's motions for directed verdict, made at conclusion of plaintiff's evidence and renewed at conclusion of all the evidence, were overruled. Thereupon, the jury returned a verdict in favor of plaintiff and against defendant, and judgment was rendered thereon. Defendant then filed a motion for judgment notwithstanding the verdict or in the alternative for a new trial. After a hearing, the trial court sustained defendant's motion for judgment notwithstanding the verdict, and vacated and set aside the verdict and judgment theretofore rendered. Therefrom plaintiff appealed, assigning that the trial court erred in sustaining defendant's motion and rendering judgment for defendant, which was allegedly

not sustained by the evidence but was contrary thereto and contrary to law. We conclude that the assignment has no merit. In that connection, since defendant's cross-appeal relating to the alleged erroneous overruling of its motion for new trial became pertinent only if plaintiff's assignment of error was sustained, it falls of its own weight by affirmance of the judgment of the trial court, and requires no further discussion.

The only question requiring decision on the merits is whether or not the trial court erred in concluding that the evidence was insufficient to sustain a verdict and judgment in favor of plaintiff. The procedure for determination of that question has been well established.

In that connection, this court has held that: "A motion for directed verdict or for judgment notwithstanding the verdict must, for the purpose of decision thereon, be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor, and to have the benefit of every inference that can reasonably be deduced from the evidence." Crane v. Whitcomb, 160 Neb. 527, 70 N. W. 2d 496.

As held in Wagoun v. Chicago, B. & Q. R. R., 155 Neb. 132, 50 N. W. 2d 810: "An appeal from an order of the district court granting a motion for a judgment notwithstanding the verdict requires this court to consider the entire record and to determine whether it does or does not justify the action of the trial court."

As said in Fairmont Creamery Co. v. Thompson, 139 Neb. 677, 298 N. W. 551: "A mere scintilla of evidence is not enough to require the submission of an issue to the jury. The rule is well stated in Farr Co. v. Union P. R. Co., 106 Fed. (2d) 437, as follows: 'The rule is that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed

to find a verdict for the party producing it, upon whom the burden of proof is imposed.'" See, also, Armer v. Omaha & C. B. St. Ry. Co., 153 Neb. 352, 44 N. W. 2d 640.

In Kohl v. Unkel, 163 Neb. 257, 79 N. W. 2d 405, this court held: "Where the facts adduced to sustain an issue are such that reasonable minds can draw but one conclusion therefrom, it is the duty of the court to decide the question, as a matter of law, rather than submit it to a jury for determination."

Also, in Leach v. Treber, 164 Neb. 419, 82 N. W. 2d 544, we held: "If, from undisputed evidence, different minds may not reasonably reach different conclusions or draw different inferences, the trial court should render judgment consistent with the facts.

"As a general rule, a party calling a witness vouches for his credibility and is ordinarily bound by any evidence he gives which is not. contradicted or shown to be unreliable by evidence which would justify the trier of facts in arriving at a different conclusion." See, also, Davis v. Dennert, 162 Neb. 65, 75 N. W. 2d 112.

In addition, this court and many others have established the fundamental evidentiary basis of liability for false arrest and imprisonment. For example, in Baker v. Coon, 102 Neb. 243, 166 N. W. 555, this court held: "One who merely states to an officer what he knows of a supposed offense, without making any charge or requesting an arrest, does not thereby make himself liable for false imprisonment."

In Jonson v. Heller, 142 Neb. 380, 6 N. W. 2d 359, plaintiff Jonson, who was an employee of defendant, S. N. Wolbach Sons, Inc., sought damages from said corporation and one Samuel G. Heller, in charge thereof, for false imprisonment. In that opinion, reversing a judgment in favor of plaintiff and dismissing the cause, it was said: "A gladstone bag was stolen from the store, which fact was reported to Heller, who in turn reported it to the chief of police, and a request was

made upon the chief of police that he make an investigation. Pursuant to this request the chief of police sent an officer or officers to the store. The officer or officers did not know the plaintiff so, on request, defendant Heller described him. Thereupon and after plaintiff left the store, an officer requested plaintiff to accompany him to the police station. Plaintiff did accompany him to the police station where he remained for questioning for some period of time when he was allowed to leave.

"There is no direct evidence whatever, nor is there any evidence from which a reasonable inference could be drawn, that Heller or any one on his behalf or on behalf of the defendant corporation accused plaintiff of the taking of the bag, or requested or suggested his detention, or in any wise directed, counseled or advised the chief of police or any police officer in the investigation which had been requested. On the record whatever was done in the investigation was at the sole instance of the chief of police." As hereinafter observed, that case is comparable in all material respects with that at bar.

As stated in 22 Am. Jur., False Imprisonment, § 33, p. 376, citing supporting authorities: "Where a person merely directs the attention of a police officer to what he supposes to be a breach of the peace and the officer, without other direction, arrests the offender on his own responsibility, the person who did nothing more than to communicate the facts to the officer is not liable for causing the arrest, even though it is made without a warrant. If the arrest is made without the knowledge and consent of such person, there is no liability."

Also, as stated in 35 C. J. S., False Imprisonment, § 24, p. 527, citing supporting authorities: "An individual who directs or requests an illegal arrest is liable for false imprisonment, but one who merely gives information regarding an offense does not incur liability."

In Annotation, 21 A. L. R. 2d, § 23, p. 694, citing and discussing authorities, it is said: "The mere giving of information to an officer tending to show that a crime has been committed is not enough to render the informer guilty of a resulting false imprisonment by an officer, and this is so even if the information purports to show that the person later falsely arrested is the one who committed the alleged crime."

Also, in Annotation, 21 A. L. R. 2d, § 26, p. 703, citing and discussing authorities, it is said: "Where the investigation was of some past offense, and the defendant's part in it was that of assisting officers to discover or apprehend the offender, the defendant's liability depends on evidence that he not only promoted the investigation, or took an active part in it, but affirmatively directed or procured the police to arrest the plaintiff without warrant as the guilty person."

Also, as said in Annotation, 21 A. L. R. 2d, § 26, p. 707: "The mere fact that when a police officer accosted the plaintiffs and asked them to go to the police station with him and detained them there, the officer was accompanied by the defendant's superintendent, will not warrant the inference that the police did not act entirely on their own judgment, and in the performance of their duties as public officers."

Further, as said in Annotation, 21 A. L. R. 2d, § 27, p. 710: "Accompanying an officer to identify one suspected of an offense, especially if it is done at the request of the officer, is no more than the giving of information in assistance of the police, and if not accompanied by acts of affirmative persuasion or of voluntary participation in the physical trespass, is not ground of liability."

In the light of the foregoing authorities, we have examined the record, which, as summarized, fairly discloses the following: Plaintiff was employed as a lineman for Commonwealth Electric Company doing subcontract work for defendant which was engaged in the

production and distribution of electric power.

For sometime prior to about June 8 or 9, 1955, substantial quantities of valuable wire had been disappearing by theft from defendant's various substations in the Omaha area. There had been a dozen or more such incidents, the most recent having occurred on June 6, 1955. Such losses had been reported to the Omaha police department by Paul Feistner, defendant's superintendent of distribution. However, the police had not been able by investigation to uncover any definite evidence indicating who was responsible for defendant's losses.

There is some confusion about dates, but on June 8 or 9, 1955, defendant's assistant superintendent of distribution, one George Foot, attended an invitation meeting at defendant's North Omaha plant to watch tests being run on some new equipment. He left that meeting about 11 p. m., and started home in a company car. With defendant's recent wire thefts in mind, he decided to drive by two of its substations on his way home. He drove past the substation at Thirty-first and Sprague Streets without noticing anything unusual, and then proceeded to defendant's substation at Forty-sixth Avenue and Jones Street.

As Foot approached the latter spot at about 11:30 p. m., he saw a car parked at the north curb, headed west, without lights, in the vicinity of the substation gate. The right door of the parked car was open, with a man standing at the curb about 10 feet from the gate. As Foot proceeded slowly past, he saw and noted the front license plate number of the parked car. He then turned around at the end of the block and drove slowly back, whereupon he saw and noted the license plate number again on the rear of the parked car. However, as he so approached again, the other car drove away. Foot then stopped his car and first checked over defendant's yard with his car spotlight. He then got out of his car and, unlocking the gate, checked de-

fendant's yard with his flashlight, but found nothing missing. In that connection, it was subsequently ascertained that no property had disappeared from defendant's substations on the night involved.

There were few residences in the general area of defendant's substation at Forty-sixth Avenue and Jones Street, and as usual there was no other traffic on such streets at that time of night. It was too dark for Foot to identify the man standing at the curb or to form more than a vague description of the parked car. It was Foot's impression that it was one of the smaller makes, light grey or green in color, and not a late model. However, he did get a good look at the parked car's license plates, both front and rear, and was certain that they were Nebraska license number 1-19275.

The next morning Foot reported what he had observed to Feistner, his superior, who thereafter reported that information by telephone to the Omaha police department. In doing so, however, Feistner did not suggest what the police should do with the information so reported by him.

On the morning of June 11, 1955, two detectives from the police department appeared at Feistner's office. They had been assigned to and received instructions from the detective bureau to investigate the report made by Feistner. Such visit by the detectives had not been requested by Feistner, but was made as routine procedure when such information had been given to the police department. In that connection, the record discloses that such detectives had theretofore checked appropriate sources of information and found that license number 1-19275 was registered in the name of plaintiff's wife and that she and plaintiff lived in a trailer court. There the detectives had also theretofore visited briefly with plaintiff and his wife about their car and where it had been on the night involved. They had then informed plaintiff that they would check a little more and return later, which they did.

Both plaintiff's witnesses and those of defendant substantially agreed in all material respects regarding what was said and done in Feistner's office and what occurred thereafter. After the detectives arrived at Feistner's office, Foot was invited to come there. At that time he again identified the license number of the parked car seen by him, but stated that he was not sure that he could identify the car itself. One detective, as a witness for plaintiff, recalled that Foot described it as a "light green or gray car." The other detective, as a witness for plaintiff, recalled that Foot said the car "looked to him as if it might be a Plymouth."

After a discussion of the matter, both detectives, and Feistner as well, expressed the opinion that it was suspicious that a car would be parked in front of defendant's substation at such a late hour in so isolated a place and under such circumstances as heretofore described. Feistner suggested to the detectives that he thought they should check on the license number of the parked car and interview the driver if he could be found. However, it was the independent judgment of both detectives that the circumstances warranted such action, and they did so upon their own responsibility. Neither Feistner nor Foot requested or suggested that anything else should be done. As testified by one such detective, "That was left up to us." As stated by the other detective, "There was nothing unusual whatsoever. We had the information given to us that a car was parked near the Supply Yard at 11:30 at night and in all cases of that type the time element is a predominating factor and it was worthy of investigation. We considered it worthy and I went through with it."

At conclusion of the conference, at Feistner's office, the detectives requested Foot to go with them to the trailer court where plaintiff's car was parked, and identify it. Thus he went with them in the police car. Upon arrival, he identified the license number but was

unable to identify the car itself as the one he had seen parked at defendant's substation, and he so informed the detectives.

Upon arrival, the detectives parked their car about 50 feet from plaintiff's trailer and left Foot sitting in the back seat of the police car while they went into plaintiff's trailer, where they remained 5 or 10 minutes talking with plaintiff in the presence of his wife. Foot was not in any position to and did not see, hear, or direct anything that went on while the detectives were inside plaintiff's trailer. When they came out, one detective and plaintiff, whom Foot did not then know, got in plaintiff's car, and the other detective and Foot got in the police car, whereupon they drove away. In that connection, plaintiff drove his own car and the other detective drove the police car. Thereafter, while driving away or preparing to do so, Foot was told by the detective who drove the police car that they were going to the police station, but Foot was not told whether plaintiff was going voluntarily or involuntarily, or what the detective intended to do with plaintiff. As a matter of fact, as testified by plaintiff, the detective said to him, " 'You come with us and we will straighten this up' " and plaintiff replied " 'All right.' "

Upon arrival at the police station, Foot was told to wait in an outer office and he did so while the detectives and plaintiff went into the detective bureau. Some 15 or 20 minutes later, one of the detectives told Foot to go down and wait in the police car and in a few moments the detective would take Foot back to defendant's office. That was done without Foot having directed or taken any part in the proceedings at the police station, and at the time he left he did not know what had been done or what other information had been obtained by the police except that the detective who drove him back to defendant's office commented on the way that they were continuing to question plaintiff about defendant's recent wire losses.

In that connection, the detectives who took plaintiff and Foot to the police station took no further part in the matter after arriving there. The questioning of plaintiff was conducted by an inspector and a captain of detectives. After questioning plaintiff about his background, employment, and whereabouts on the night in question, the captain decided to order plaintiff booked for investigation, and he did so without consulting with or notifying defendant or any of its representatives aforesaid. Thus, during the remainder of Saturday, June 11, 1955, and part of the next day, plaintiff was held in jail and questioned at various times by the captain and inspector. Throughout such proceedings, plaintiff denied that his car was parked at defendant's substation as heretofore set forth, and denied any connection with the thefts of wire, although, as expressed by plaintiff, "I stuck my neck out and it caused me more grief," by expressing an opinion as to why and how the losses occurred, which expression led the captain and inspector to intensify their interrogation of plaintiff.

On Sunday afternoon, plaintiff was released from jail on bond. On Monday morning following, he voluntarily appeared before another captain of detectives who gave plaintiff some five polygraph tests, the results of which were inconclusive. On Monday afternoon plaintiff went back to work for Commonwealth Electric Company, and continued to do so until in November 1955 when he left and went to work for another company in California. In the meantime, however, this action was filed on October 28, 1955.

Feistner and Foot did not even know that plaintiff had been booked and jailed by the police until after plaintiff had returned to work. The police department did not so advise them or any other representative of defendant in any manner during plaintiff's arrest or confinement. The first time they knew of it was when the captain or inspector of detectives called Feistner by telephone and advised him that nothing had been dis-

covered that would connect the license number reported to the police with any of defendant's wire thefts.

The record discloses that no employee of defendant ever promoted, suggested, directed, or requested plaintiff's arrest. The police did so on their own initiative without any request. The inspector, as a witness for plaintiff, testified: "After they gave us that information * * * we take action without a request." Also, no representative of defendant ever offered or agreed to file a complaint against plaintiff, or told any police officer that he believed plaintiff had committed a crime. As a matter of fact, when called about it, Feistner said he would not care to file any charge against plaintiff.

Other evidence relating to plaintiff's alleged expenses and damages appears in the record, but in view of our conclusions, its recitation here would serve no useful purpose. In the light of the record and applicable controlling authorities heretofore cited, we conclude that the evidence was insufficient to support any verdict and judgment for plaintiff and against defendant.

To hold otherwise would not only impair the official machinery for the ascertainment of truth by investigation of reported crimes, but would also interfere with and tend to make impossible the enforcement of criminal law by tending to destroy with fear and threats the recognized right and duty of the public to give information to law enforcement officers, which is a most effective instrument in the administration of criminal justice.

For reasons heretofore stated, we conclude that the judgment of the trial court should be and hereby is affirmed. All costs are taxed to plaintiff.

AFFIRMED.