WILLIS BAER, APPELLEE, V. OTTO SCHAAP, DOING BUSINESS
AS SPEEDWAY SCAFFOLD COMPANY, APPELLANT, IMPLEADED
WITH PARSONS CONSTRUCTION CO., A CORPORATION,
APPELLEE.
106 N. W. 2d 468

Filed December 9, 1960. No. 34497.

*Webb, Kelley, Green & Byam,* for appellant.

*Rice & Adams* and *Schrempp & Lathrop,* for appellee Baer.

*O'Dowd & Swift* and *Crossman, Barton & Quinlan,* for appellee Parsons Constr. Co.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

SIMMONS, C. J.

This is an action for damages for personal injuries. Our first decision in this case is found in Baer v. Schaap, 168 Neb. 578, 97 N. W. 2d 207. A rehearing was granted. The motion for rehearing presents only two questions. The first is the sufficiency of the evidence to justify submitting the cause to the jury. We now find it necessary to decide only that question. We conclude that our former decision was in error in holding the evidence sufficient. That decision is set aside.

We reverse the judgment and remand the cause with directions to sustain the motion for a directed verdict.

We refer to our former opinion and the dissent for a more detailed general statement of the issues and facts.

We refer herein to plaintiff as Baer, who was the

injured employee of defendant Parsons Construction Company. We refer to defendant Schaap as Speedway, as he operated under the name of Speedway Scaffold Company. Appellee Parsons Construction Company is referred to as Parsons. It is in the case seeking subrogation for compensation payments to Baer. To that extent Parsons' interests and Baer's interests are identical.

Baer alleged that Speedway "erected, set in place, and rented to" Parsons certain scaffolding around a building being remodeled and that the scaffolding "thus erected" was "not erected in a safe, suitable and proper manner," so that a plank thereon gave way and dropped plaintiff to the sidewalk below to his great injury. That allegation presented the essential issue and limits the scope of the inquiry.

We are presented with two difficulties appearing in the record. The accident involved herein occurred in September 1954. The petition was filed in June 1955. The cause was at issue in February 1956. It was tried in January 1958 on amended pleadings. The delay in bringing this matter to trial obviously accounts for some if not all of the confusion, lack of memory, and contradictory statements of witnesses. Trial courts could avoid this sort of a situation by insisting on a reasonably prompt trial in these cases.

Repeatedly in this record witnesses refer to exhibits, pointing out that about which they are testifying, and "indicating" it. We have repeatedly criticized trial courts for permitting such a record to be made. It is difficult, and at times impossible, for a reviewing court to read such a record and do more than speculate as to what lawyers, court, and jury had indicated to them. We again criticize the procedure here in that regard.

The first question here is: Did Speedway place the plank in the scaffold that upended and caused Baer to fall?

The parties are in general agreement that Speedway

built a scaffold for Parsons; that Parsons accepted and used it; that Baer was an employee of Parsons; and that a plank on which he was standing gave way, causing him to fall to his injury.

There is further general agreement that the scaffolding was built of steel uprights, 7 feet apart lengthwise, and 5 feet apart from side to side. The uprights were connected by horizontal steel bars upon which the scaffold floor boards were placed.

It was agreed at the bar here and in the briefs that the scaffold was erected about 2 feet from the building and that steel brackets were placed on the scaffold to reach from the inside upright to the building. These were in the shape of a right-angled triangle with the top arm at right angles to the building and about 22 inches in length. Speedway floored the scaffold proper with planks 2 inches thick and either 10 or 12 inches in width, and 14 and 16 feet long. This becomes important in the light of evidence to be cited later.

It is undisputed that Speedway put 16-foot-long planks side by side across two of the 7-foot spaces between the supporting uprights so that they extended 1 foot at each end beyond the crossbars on which they rested. Then two spaces were skipped and another side-by-side row of 16-foot-long planks were placed as before. Then 14-foot-long planks were placed bridging that opening. These lapped over the 16-foot planks 1 foot at each end.

Speedway's construction man testified that every one of the 14-foot-long planks was nailed to the 16-foot plank beneath it. Parsons' superintendent inspected the scaffold and testified that he found from 5 to 10 percent of the planks not nailed, and nailed them. It is, then, undisputed except by argument, that before Parsons began the use of this platform every 14-foot plank which Speedway put in the scaffold was nailed to the 16-foot plank beneath it and that the overlap was 1 foot.

We must accept as a fact from the jury's verdict that Speedway did not nail all of the planks and that Parsons

undertook to do so before it permitted its use by workmen. Parsons accepted the scaffold as satisfactorily constructed.

At this point the purpose of the nailing can be recited. It is likewise undisputed and testified to by a witness for Baer that the planks were nailed if employees were going to work on them for a long time and should be nailed if it was a matter of weeks and days "because they will work" or slide back and forth so that "one end may drop." It was in the interest of good safety to nail them down.

We are, then, confronted with a record that establishes without dispute that every 14-foot plank was above the end of a 16-foot plank and any "working" of it would be against the force of gravity and that the 14-foot plank would have to "work" at least 1 foot before it could upend and fall.

We are mindful of the testimony of Baer's witness that he measured the plank that flipped up as 14 feet in length so that if it slipped "an inch or so either way" it would upend and fall.

From this evidence it is argued here that the plank which upended had only a 1-inch overlap and had to slip only that distance before it would give away on its loose end.

The fallacy of this argument is that under the undisputed evidence the plank, if put there by Speedway, would have had to slip at least 1 foot before it would upend and fall when someone got on its short end, there being no evidence that any other plank on the platform was disturbed when the one plank gave way. There is no evidence that Speedway put 14-foot planks at this point in any other position than overlapping 16-foot planks. No witness testified that the plank that upended had been resting on a 16-foot plank.

Baer's witness and Parsons' superintendent testified to the fact that the planks were nailed together; and no one testified that a nailed plank will "work." We are

not unmindful of the fact that Baer's witness testified that there were neither nails nor nail holes in the plank that upended. From that evidence, however, no inference can arise that Speedway placed this plank in the scaffold.

Were there side brackets put on the scaffold by Speedway? It is conceded here that the answer is "Yes." Baer testified that he was an experienced construction man, had erected and used scaffolds for years, and was an experienced bricklayer and foreman at the time of the accident.

The conceded physical facts are that the scaffold was to be used in removing and repairing the wall of the building and that in part an overhanging cornice was to be removed. Yet Baer testified, in effect, that there were no brackets on the scaffold, as did one other of his witnesses, as both testify that it was the inside plank on the main platform that gave way. Other witnesses testify as to the existence of the brackets.

Were planks placed upon the brackets? Speedway's construction man testified as a witness for both Baer and Speedway. He testified that he placed one row of planks on the brackets, and *"about centered"* on the brackets. The plank so centered was either 10 or 12 inches wide. So that if only 10 inches wide the planks so placed by Speedway left an opening on either side of not to exceed 7 inches, or as stated by the witness, "a small opening." Baer's witness testified that the plank which upended was 2 inches by 10 inches.

Were there other planks placed on the brackets? Parsons' construction superintendent testified that he placed a string of planks on the brackets "to hold the plywood." At one point he described them as 2 inches by 10 inches. At another point he says 2 inches by 8 inches. That evidence is undisputed. Parsons' man says it did not "change the structure" of the scaffold. But if Parsons put this row of planks there then it has to follow that the Speedway row of planks was moved over and

to the inner or outer side of the brackets to make room for it. The construction of the scaffold had to be changed by Parsons after Speedway had delivered it to them.

This conclusion is arrived at also by another bit of undisputed evidence.

A plywood apron 2 feet wide was placed on the brackets and against the building. The entire platform and plywood apron was then covered by canvas. Baer testified that the plywood was notched so as to fit over the posts of the scaffold. Otherwise brackets being absent, according to his testimony, the plywood would have no support. Parsons' man testified that he rested the plywood on the row of planks and that it then came to 1½ or 2 inches from the planks on the inside of the uprights. It follows that if he nailed the plywood to planks it was not those placed there by Speedway unless the Speedway planks had been moved after Parsons accepted complete control of the scaffold.

The canvas and plywood were removed by Parsons either the day of or the day before the accident. Baer assisted in the removal. The evidence is important here because it shows that there were neither "days" nor "weeks" that employees were using the exposed planks so as to cause them to "work." The evidence is that the plywood was nailed to the planks. There is no evidence nor contention that the plywood "worked" either way, hence it would necessarily follow that any "working" of the plank had to occur after the plywood was removed.

Which plank fell? All witnesses agree that it was the one nearest the building. It struck the building, lodged in one of the brackets, and nearly struck a fellow workman looking over the edge of the roof.

Baer and one of his witnesses testified it was the inside plank of the scaffold proper. He now recedes from that evidence. If it was the plank nearest the

building and on the brackets it could be or could not be a plank put there by Speedway.

There is no identification of it as such as a plank put there by Speedway. We are not unmindful of one bit of evidence in this regard. Parsons' man testified that the plank was a Parsons' plank. On rebuttal a claim adjuster for Parsons' insurance carrier was called as a witness. He testified that he and Parsons' superintendent had talked about who had erected or constructed the scaffolding and that Parsons' man said Speedway had installed the plank that fell. This was admitted over objection for purposes of impeachment. The court so stated and counsel for Baer replied that that was correct.

The rule is that while evidence admitted generally is in the case for any legitimate purpose, evidence which is offered and admitted for a limited purpose cannot be used for another and totally different purpose. Where, by express ruling, it is limited to one purpose, without exception, it cannot be used for another purpose. Kucaba v. Kucaba, 146 Neb. 116, 18 N. W. 2d 645.

It is said here that the jury was justified in disregarding the testimony of Parsons' superintendent because he testified that it was a Parsons' plank that upended and a witness testified that the superintendent had earlier said it was a Speedway plank.

If we are to put aside all of the testimony of this witness as to that subject matter as untrue, it leaves testimony of witnesses for Baer, including himself, in hopeless confusion.

Baer and one of his witnesses testified that there were no brackets on this scaffold. The undisputed testimony otherwise is that there were brackets. It was conceded at the bar here that there were brackets. The falling plank lodged in the brackets and did not reach the ground. Baer testified that there were planks put on the principal scaffold only. The evidence shows and it is admitted at the bar here that there were six rows of

planks (one on the brackets), as testified to by Speedway's construction man, a witness for Baer. Baer testified that the plank that upended was the one nearest the building. If his testimony is accepted, Baer was working that afternoon when the accident occurred at a height of 40 feet, washing down the wall with an ·open space of approximately 2 feet between him and the building. This presents a rather improbable situation.

However, it is undisputed also that the plank that fell struck a slight projection on the building and that in its partial revolution, with the crossarm or bracket as a pivot, it nearly hit a witness for Baer looking over the roof. There would have been no lodging in the non-existent bracket under those circumstances.

No matter whether this record is read from the viewpoint of the evidence that went to the jury, or from the viewpoint of Baer's evidence, excluding Speedway's witness (Parsons' superintendent), the result is one of hopeless confusion out of which an answer can be drawn only by confused speculation.

These rules, then, become applicable: " 'When a witness gives testimony which as to material facts is in such obvious and irreconcilable conflict that, if part of it be true the rest must be false, it cannot be accepted as the basis of a judicial conclusion.' " Butler v. Reed-Avery Co., 186 Md. 686, 48 A. 2d 436. See, also, Kaufman v. Baltimore Transit Co., 197 Md. 141, 78 A. 2d 464; Hegarty v. Berger, 304 Pa. 221, 155 A. 484; Campbell v. State, 203 Md. 338, 100 A. 2d 798.

"Where there are two or more possible causes of injury, for one or more of which defendant is not responsible, plaintiff, in order to recover, must show by evidence that the injury was wholly or partly the result of that cause which would render defendant liable. If the evidence in the case leaves it just as probable that the injury was the result of one cause as of the other, plaintiff cannot recover." 86 C. J. S., Torts, § 59, p. 984.

"* * * the causal connection between defendant's act or

omission and the injury must not be left a matter of surmise or conjecture, and cannot be established by evidence which is merely consistent with or indicates a mere possibility or probability thereof, as by evidence which merely shows two or more possible causes of the injury, for not all of which defendant is responsible; or which leaves it a matter of speculation or conjecture as between such causes; or which is equally consistent with the theory that the injury resulted from a cause for which defendant is not responsible; * * *." 65 C. J. S., Negligence, § 244, p. 1092.

Here, as we read this evidence, the answer to the question of "was it a Speedway plank that upended" is a matter of speculation and conjecture. Baer's evidence shows that it could have been and could not have been. That is not enough.

A restudy of this evidence causes us to apply the rule that the burden of proving a cause of action is not sustained by evidence from which negligence can only be surmised or conjectured. Mimick v. Beatrice Foods Co., 167 Neb. 470, 93 N. W. 2d 627.

We also apply the rule that in every case, before the evidence is submitted to the jury, there is a preliminary question for the court to decide, when properly raised, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed. Weston v. Gold & Co., 167 Neb. 692, 94 N. W. 2d 380.

Here the evidence as to who placed the upending plank in the platform is purely circumstantial. We apply the rule that where several inferences are deducible from facts presented, which inferences are opposed to each other but equally consistent with the facts proved, the plaintiff does not sustain his position by a reliance alone on the inference which would entitle him to recover. Shamblen v. Great Lakes Pipe Line Co., 158 Neb. 752, 64 N. W. 2d 728.

At the conclusion of Baer's evidence and again at the conclusion of all of the evidence, Speedway moved for a directed verdict. Speedway later moved for judgment notwithstanding the verdict. These motions were overruled.

The situation calls for the application of the rule that in a case where a motion has been made at the close of all of the evidence for a directed verdict, which motion should have been sustained but was overruled and the case was submitted to a jury which returned a verdict contrary to the motion, and a motion for judgment notwithstanding the verdict is duly filed, it is the duty of the court to sustain the motion and render judgment in accordance with the motion for a directed verdict. Corbitt v. Omaha Transit Co., 162 Neb. 598, 77 N. W. 2d 144.

The judgment of the trial court is reversed and the cause remanded with directions to sustain the motion for a directed verdict.

REVERSED AND REMANDED WITH DIRECTIONS.

WENKE, J., dissenting.

I disagree with the present opinion of this court, which sets aside our former opinion herein upon the ground that the evidence is not sufficient to justify submitting the cause to a jury. In my opinion the evidence adduced at the trial was sufficient to justify the trial court's submitting the issue of appellant's liability to the jury.

In view of the fact that the author of the court's present opinion, when referring to the evidence, uses such expressions as "undisputed," "undisputed except by argument," "without dispute," "no inference can arise," "conceded," "witnesses agree," "hopeless confusion," and "a rather improbable situation," I call attention to the fact that this is a law action in which a verdict has been rendered and that the record on appeal is not before us for review de novo.

We have frequently held, in such cases, that it is not

the province of this court, in reviewing the record in an action at law when a verdict has been rendered, to resolve conflicts in or weigh the evidence. In testing the sufficiency of the evidence to sustain such verdict admissible testimony tending to support the case of the successful party should be accepted as the truth. See, Garbark v. Newman, 155 Neb. 188, 51 N. W. 2d 315; Snyder v. Farmers Irr. Dist., 157 Neb. 771, 61 N. W. 2d 557; Harris v. Pullen, 169 Neb. 298, 99 N. W. 2d 238. It is the same rule, in principle, as applies to a ruling on a motion for a directed verdict or for a judgment notwithstanding the verdict. See, Anderson v. Evans, 164 Neb. 599, 83 N. W. 2d 59; Edgar v. Omaha Public Power Dist., 166 Neb. 452, 89 N. W. 2d 238. As stated in Anderson v. Evans, *supra:* "In determining the question of whether or not a motion of a defendant for a directed verdict or for judgment notwithstanding the verdict should be sustained the court is required to consider the evidence in the light most favorable to the plaintiff and to resolve every controverted fact in his favor, and he should have the benefit of every inference that can reasonably be deduced therefrom."

In view of certain principles stated in this court's present opinion, I call attention to the following holdings of this court:

"In an action for damages for negligence the burden is on the plaintiff to show by direct or circumstantial evidence that there was a negligent act or omission by the defendant and that it was the proximate cause of plaintiff's injury or a cause which proximately contributed to it." Weston v. Gold & Co., 167 Neb. 692, 94 N. W. 2d 380.

"Negligence is a question of fact and may be proved by circumstantial evidence. All that the law requires is that the facts and circumstances proved, together with the inferences that may be legitimately drawn from them, shall indicate, with reasonable certainty, the neg-

ligent act complained of." Davis v. Dennert, 162 Neb. 65, 75 N. W. 2d 112.

I shall review the record for the purpose of disclosing why I think the evidence adduced justified the trial court submitting this cause to the jury.

Parsons Construction Company, to which I shall hereinafter refer as Parsons, had a contract to tear down the cornicing along the top of the north and west walls of the three-story Patterson Building located at the southeast corner of Seventeenth and Farnam Streets in Omaha, Nebraska, and to replace it with a brick firewall to be capped with stone. To carry out this contract Parsons entered into an oral lease agreement with Otto Schaap, doing business as Speedway Scaffold Company and hereinafter referred to as Speedway, to build a suitable scaffold on the north and west sides of this building for the use of Parsons' employees in performing this contract. Speedway constructed a metal frame scaffold with a wooden platform for this purpose and on August 23, 1954, turned it over to Parsons. This wooden platform consisted of two parts, that inside the frame structure of the scaffold itself and that on brackets, whenever used. Parsons' employees thereafter used this scaffold in performing the contract. On September 14, 1954, about 2 p.m., appellee Willis Baer, an employee of Parsons, fell from the platform of the scaffold to the concrete sidewalk below, a distance of some 35 to 40 feet, seriously injuring himself.

Before discussing the details of the situation I think it would be best to introduce the witnesses and how they fit into the picture. Edward Connolly, to whom I shall refer as Connolly, was and is a salesman for Speedway. However, he supervised and actually performed the major part of the work of installing the scaffold. Henry Chris Sorenson, to whom I shall refer as Sorenson, was employed by Parsons as its general construction superintendent to oversee the work of all its smaller jobs, then six in number, which, on September 14, 1954,

included the Patterson Building job. Appellee Willis Baer, to whom I shall refer as Baer, was an employee of Parsons and, on the Patterson Building job, foreman of the brick work, being a bricklayer by trade. Dale Gosch, to whom I shall refer as Gosch, worked as a laborer for Parsons on the Patterson Building job and actually saw Baer fall, being on the roof of the Patterson Building at the time of the accident and only about 3 feet from Baer when he fell. Charles LeRoy Cato, to whom I shall refer as Cato, also worked as a laborer for Parsons on this job and was on the roof of the Patterson Building when the accident occurred. He did not see the accident. However, he did see Baer on the sidewalk immediately after it happened and removed the plank that upended from where it had lodged in the scaffold. E. F. Morgan, to whom I shall refer as Morgan, was employed by the Fidelity Casualty Company of New York as a claim adjuster and, in behalf of Parsons, interviewed Sorenson about the accident on both October 12 and November 25 or 26, 1954, in connection with workmen's compensation liability.

Connolly testified that in building the platform for the scaffold they used both 2 x 10- and 2 x 12-inch planks of which some 35 were 14 feet long and 40 were 16 feet long. He further testified that on the main deck of the scaffold, between the upright posts, he installed a platform five planks in width and that on the brackets he installed a platform one plank in width, using either 2 x 10- or 2 x 12-inch planks on the brackets, and that he centered the planks installed on the brackets. Brackets were used on the north side where Baer fell.

That a jury could find there was negligence in the construction of the scaffold used by Parsons is evidenced by the following: Connolly testified whenever a scaffold was to be heavily used over a period of time, such as was here contemplated and done, the planks used in building any platform thereon should be nailed to prevent the planks from sliding or working; that he

did the nailing; that he checked to be sure that all planks used in the platform floor were securely nailed; and that he knew of no plank included in the flooring of the scaffold which hadn't been so nailed. However, Sorenson testified that before he let employees of Parsons use the scaffold, after it was turned over to him by Speedway on August 23, 1954, he inspected the scaffold in detail; that he found Speedway had nailed only about 90 to 95 percent of the planks used in the floor of the scaffold; that from 5 to 10 percent had not been nailed; and that he nailed or put cleats on the 5 to 10 percent that had not been nailed to keep them from sliding or working. When I refer to planks used by Speedway in constructing the platform of the scaffold I include those placed on the brackets. When we bear in mind, as will hereinafter be brought out, that the plank that upended and let Baer fall had neither been nailed nor cleated, then it can be understood how a jury could find that whoever installed that plank in the platform of the scaffold did so negligently, and that such negligence caused the accident.

But, was there evidence from which a jury could find that the plank that upended was placed in the platform by Speedway?

Baer fell at a point on the north side of the building about midway thereof. At the time he was cleaning mortar stains from the face of the brick of the new firewall with a sponge. At that point the main scaffold had been placed some distance (probably about 22 inches) from the wall because the cornice on the building, which was later torn down, stuck out that far and prevented the upright posts of the scaffold from being placed any closer to the wall itself. To bridge this gap, so the workers using it could get closer to the building, brackets were attached to the upright posts of the scaffold, which brackets extended over to the wall and were some 22 inches in length and had a surface on which to place planks for a platform of some 21½ inches.

Connolly testified he placed only a one-plank width platform on these brackets, which he centered, before turning the scaffold over to Parsons because Sorenson advised him that a one-plank width on those brackets would be enough.

When the scaffold was turned over to Parsons, Sorenson said there was a gap of some 14 or more inches between the planks on the platform and the wall of the building so he took strips of ¾-inch plywood, 2 feet wide, laid them up against the wall, about a foot above the platform, and toe-nailed them to the platform planks; and that he then placed a canvas tarpaulin over the top edge of this plywood board and spread it clear across the platform of the scaffold in order to prevent the debris from the cornice, as it was being torn down, from falling down onto the sidewalk.

The canvas and plywood on the scaffold north of the building remained in place until the morning of September 14, 1954, when Baer caused it to be removed. The platform of the scaffold, after the canvas and plywood had been removed, was then back in the form in which it was when it was covered by the canvas, as Baer testified that nothing was taken from or added to the platform of the scaffold at the time this canvas and plywood were removed.

It is true that Sorenson testified that he had placed additional (2 x 8- or 2 x 10-inch) boards or planks in the platform on the brackets north of the building before putting up the plywood and placing the canvas thereon. However, the jury was not bound to believe this statement because Sorenson was thoroughly discredited and impeached on this and many other facts about which he testified in connection with the scaffold and the accident. Morgan testified that Sorenson told him, during the interviews he had with him shortly after the accident, that Parsons had never added any boards or planks to the platform of the scaffold constructed by Speedway. Connolly also testified that

Sorenson advised him that one plank was all that need be placed on the brackets. Sorenson testified he put up the plywood to cover a 14- to 18-inch gap between the plank on the bracket and the north wall, which would not be the situation if there had been two planks on these brackets. Baer also testified there was a 6- to 8-inch gap between the platform he was standing on at the time he fell and the wall, which would only be true if there had been but one plank on the bracket but not if there had been two. I think a jury could properly find that there was only a one-plank width on the bracket at the time that Baer fell; that it had been placed there by Speedway; and that the plank used, being only 14-feet long and neither nailed nor cleated, was negligently installed by Speedway for, by so installing it, the plank could work or slide when used and then upend whenever it had slid an inch or more and the overlap ceased to exist.

It is true that some of Baer's witnesses were mistaken in where the plank that upended was in the platform itself, but all of them correctly placed it as the one nearest the building. Cato testified he knew there were brackets there on which planks had been placed, however, he testified the plank that upended and fell constituted part of the main floor of the scaffold, being a plank inside the posts thereof. However, he also testified it was the inside plank, the one next to the building, that fell as that is where Baer was working. Gosch, who was on the roof of the Patterson Building and an eyewitness to the accident from only a few feet away, testified the plank that upended and let Baer fall to the sidewalk below was part of the main floor of the scaffold and inside the uprights. However, Cato was not certain whether there were brackets on the scaffold extending over toward the building, as he didn't pay any particular attention to that, but doesn't think there were although he wouldn't definitely say there weren't any. He does testify that Baer fell next to the building and

that the plank next to the building is the one that up-
ended. Baer testified he fell straight down next to
the building and that the plank next to the building,
some 6 or 8 inches from it, was the one that gave way.

It would only seem logical for the jury to find that
the plank that upended and let Baer fall was the one
next to the building. Thus, it seems to me from the
evidence I have discussed, a jury could properly find
that Speedway placed the plank that fell on the brackets
without nails or cleats and so short that it would only
have about a 1-inch overlap, since the upright posts on
which these brackets were placed are 7 feet apart.

That the jury could properly disbelieve anything Sor-
enson testified to is further evidenced by the following:
Sorenson tried to identify the plank that fell as one he
had selected from lumber in the Parsons' yard and used
in connection with a derrick that Parsons had installed
on top of the roof of the Patterson Building. This der-
rick was used to lift materials they needed in connection
with the job up onto the roof, particularly the capping
stones for the firewall which weighed some twelve hun-
dred pounds each. Sorenson testified these stones had
been lifted onto the roof some 10 days to 2 weeks be-
fore September 14, 1954, and immediately placed on the
firewall as capping because, due to their weight, they
couldn't be left on the roof. Just how or when any of
these planks could have gotten into the platform on the
brackets Sorenson did not try to explain.

The facts are, as testified to by other witnesses and
clearly shown by one picture offered in evidence, that
the capping had not been placed on the firewall on
September 14, 1954, and that it was not lifted to the
roof until shortly before November 1, 1954, when it was
placed as capping on the firewall.

Sorenson identified the planks he selected from the
yard of Parsons as 4 planks, some 12 or 13 feet in
length and 2 x 12 inches in dimension. The plank that
fell was 14 feet long and 2 x 10 inches in dimension.

Finally Sorenson admitted that he told Morgan in the interviews had with him shortly after the accident that Speedway had installed the plank that fell from the platform and Morgan corroborated the fact that Sorenson had so advised him.

I bring out the foregoing for the reason that Sorenson is the only witness that I can find who testified to the fact that Parsons had added any plank to the platform of the scaffold after the scaffold had been turned over to it by Speedway. The jury, in my opinion, was completely justified in not believing Sorenson in this respect for the reason that I have already stated. If it did not believe him in this respect then all the planks that were on the platform at the time Baer fell had been placed there by Speedway and if it so found, as I think it had a perfect right to do, based on the record before us, then the jury also had a right to find from the evidence adduced that the manner in which it was placed there by Speedway was negligent and that such negligence was the proximate cause of its upending and letting Baer fall to the sidewalk below, some 35 to 40 feet, and causing the injuries for which the jury had given him financial relief.

In my opinion the record presents a jury question.

CHAPPELL, J., joins in this dissent.

MESSMORE, J., concurs in this dissent for reasons set forth in the court's original opinion.