WILSON GRAIN COMPANY, INC., A CORPORATION, APPELLEE, v. DON RESSO, APPELLANT, IMPLEADED WITH STECKLEY HYBRID CORN COMPANY, A CORPORATION, APPELLEE.

140 N. W. 2d 18

Filed February 4, 1966. No. 36065.

Chauncey C. Sheldon, for appellant.

Crosby, Pansing, Guenzel & Binning and Theodore L. Kessner, for appellee Wilson Grain Co., Inc.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ.

SPENCER, J.

Wilson Grain Company, a corporation, hereinafter referred to as Wilson, instituted this action for negligence and breach of warranty against Don Resso, hereinafter referred to as Resso, and Steckley Hybrid Corn Company, hereinafter referred to as Steckley. A jury was waived. Upon trial to the court, the action was dismissed as to Steckley and judgment was entered in favor of the plaintiff and against Resso in the amount of $7,179.78. Resso perfected an appeal to this court.

Wilson operates several country grain elevators, one of which is located at Murray, Nebraska. It is what is known as a one-man operation, with Richard Schanot, hereinafter referred to as Schanot, as its only employee. On August 20, 1959, Schanot purchased approximately 1,350 bushels of yellow corn from Resso at the Murray elevator. Resso had purchased this corn from Steckley at a reduced price. It was sold to Wilson as top-quality corn at the market price. It is undisputed the corn had been treated with Captan, a chemical substance used by producers of seed corn to prevent soil-borne diseases.

Steckley had used a light pink coloring on the corn to identify it as treated corn. There is a dispute as to whether Captan-treated corn is fit for livestock feed, but there is no dispute it is not fit for human consumption.

It is also undisputed that the Federal Seed Act required the labeling of seed corn treated with Captan when sold or offered for sale in interstate commerce. That act also required a statement of limitation against use of such corn for feed, food, or oil purposes, to be placed on the container holding it. At the time Resso purchased the corn he knew it was packaged in bags which were labeled to indicate the fact it had been treated with Captan, and should not be used for feed, food, or oil purposes. Steckley, at his direction, emptied the corn from the labeled sacks directly into the truck. No supervision or control was exercised by Steckley after the corn was sold to Resso. It was stipulated that Resso signed an agreement with Steckley at the time he purchased the corn that he would not mill the corn nor resell it to any party for the purpose of milling or using the same for feed, food, or oil purposes, nor would he sell the corn to any person who might place it in regular channels of commerce wherein the corn might be susceptible to such use. It is also evident that Resso hauled the corn directly from Steckley to the Wilson elevator at Murray.

During the unloading of the first truckload of the corn into the elevator pit at Murray, Schanot noticed that some of the corn had a pink cast, and when he called Resso's attention to it, he was informed that this was because it had been marked to distinguish it as 2-year-old corn. Schanot's testimony is as follows: "I said, 'Don, I don't know if I can use the corn. I may have to load this corn back up.' He said, 'Why?' I said, 'What's this pink coloring on this corn?' He said, 'That's nothing but cake dye.' I said, 'Was this Steckley's corn?' He said, 'Yes, this was Steckley's corn. That's nothing but cake dye where they determine their two-year-old corn.'

I said, 'Well, I will have to go in and call the office.' So, I said, 'Come on in with me.' He came in the office with me and I set down at the desk at the phone. He was standing beside the phone. Standing beside the desk. I talked to Mr. Noske and I told him that I was getting in this corn, this corn I talked to him about before from Resso, and it had coloring on it. First thing he asked me, if it had been treated with anything poisonous; and I turned and asked Mr. Resso. He said, 'No; this corn is not treated with anything poisonous. All that is is a cake dye to determine the corn, determine the year of the corn. That cake dye would determine the year of the corn.' So I told Mr. Noske what—he was waiting on the phone when I asked Mr. Resso about this—and Mr. Noske said then, 'If the corn hasn't—if he claims the corn isn't treated with anything poisonous, why go ahead and take it.' "

Resso was not present and did not testify at the trial, but it was stipulated that if present he would testify that he told Schanot he acquired some seed corn from Steckley which he would be willing to sell at a reasonable figure because it had been treated and could not be used for any purpose other than livestock feed. This testimony lacks credence considering the price Wilson paid Resso for the corn. Wilson's evidence indicates it was purchased as best quality corn and priced accordingly. The corn was dumped into the elevator pit, where it was carried into the elevator by conveyor buckets. It is undisputed the only corn to which a coloring agent had been added and handled by Wilson during this period was the Resso corn.

Wilson at that time held a contract or license with the Commodity Credit Corporation to handle government grain called in for delivery from the farms on which it had been stored. This contract permitted Wilson to commingle the grain, and required only that grain of equal quality be delivered to the destination designated by the Commodity Credit Corporation. On August

19, 1959, Wilson was directed by the Commodity Credit Corporation to ship 16 carloads of yellow corn to St. Joseph, Missouri.

Because railroad cars were not readily available, it was necessary that some of the corn, when delivered to Wilson, would be put into the elevator and transferred to cars when they were available. When the first two cars were received at the elevator, Wilson did not have enough Commodity Credit Corporation corn on hand to ship out, and, under its commingling agreement, filled the cars with grain in the elevator, including some of the Resso corn.

There are two methods of loading corn into cars at the Murray elevator. One is the truck weight method whereby grain is weighed on the trucks and loaded directly into the cars. This method was used for the third car. The second method is the hopper scale method whereby grain is moved through the bins in the elevator, weighed through a hopper scale located under a scale bin, and then elevated into the car. The first, second, fourth, and fifth cars were loaded by the hopper scale method. The balance of the Resso corn was loaded into the fourth and fifth cars.

The shipments were inspected and sampled at St. Joseph, Missouri, by a representative of the Food and Drug Administration, and cars Nos. 1, 2, 4, and 5, which contained corn with which the Resso corn had been commingled, were found to be contaminated and unsuitable for either human or animal consumption because of the presence of an unknown substance which was later identified as Captan. The Commodity Credit Corporation stopped all payments to Wilson, and it was directed to appear in federal court at Kansas City, Missouri, on an investigation of a charge of violation of the Federal Food, Drug, and Cosmetic Act. Before the stop order, a total of 13 cars had been shipped from Murray. Only the four cars containing Resso corn were condemned.

The condemnation of the four cars of corn caused

Wilson to lose the value of the corn; its license to handle Commodity Credit Corporation grain was suspended at all of its elevators; it was necessary to incur expense to get the matter adjusted; and Wilson suffered losses as a result thereof. The damages proved herein, however, relate only to the loss at Murray.

Resso assigns as error the overruling of his motion for summary judgment. To justify the entry of a summary judgment, the record must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Storz Brewing Co. v. Kuester, 178 Neb. 135, 132 N. W. 2d 341. We determine that Resso, the moving party, was not entitled to judgment as a matter of law at that stage and the motion was properly overruled.

A stipulation of case stated was on file at that time. Its pertinent parts may be briefly summarized as follows: Resso sold the corn to Wilson with a representation that it was marketable and fit for use for feed, food, or oil purposes; that said representation was false and Resso breached his warranty of fitness; that said corn was commingled with other corn and loaded into four railroad cars, which were condemned at St. Joseph, Missouri, because of the presence of the Resso corn; and that Wilson as a result thereof sustained damage.

It was stipulated that there was no genuine issue as to the following facts: Steckley sold the corn in question to Resso, and Resso in turn sold said corn to Wilson. The corn had been treated with Captan and some of its kernels contained a pink-colored dye to distinguish it as treated corn. "(c) The dye colored kernels contained in the corn sold by the defendant Steckley to the defendant Resso to the plaintiff contained Captan. Certain kernels of corn with an identifying pink color were discovered by government inspection in the four carloads in question; and such kernels were found to contain Captan. The marketing of any corn containing Captan,

in regular channels of interstate commerce is unlawful; which fact resulted in the condemnation of the four carloads in question." Resso at the time of the purchase executed a written agreement with Steckley that he would not mill the corn nor resell it to any other party for the purpose of milling or using the same for human consumption, nor sell the corn to any person who might place it in the regular channels of commerce wherein the corn might be susceptible to such use. Wilson's manager observed some pink-colored kernels in the corn which he purchased from Resso, and to the best of his knowledge, Wilson had never purchased nor handled any other corn containing identifying pink-colored kernels. After purchase, the Resso corn was placed in handling bins in Wilson's elevator. Within 8 days thereafter, the four cars in question were loaded at the Wilson's Murray facilities under the supervision of Schanot. In a deposition taken February 3, 1963, more than 3 years later, Schanot testified he did not know when the corn was shipped out, what corn it was included with, nor where it went.

Resso's motion is premised on Schanot's testimony in the deposition. It ignores the fact that the corn was not as represented; and that Resso had signed an agreement not to resell the corn to anyone who might place it in the regular channels of commerce. He could not help but know that selling it to the Murray elevator would do just that. It also ignores the fact that the only pink-colored corn handled at Murray during the period was the Resso corn, and that each of the cars condemned were condemned because of pink-colored corn containing Captan.

Resso assigns as error the refusal of the trial court to strike the testimony of Schanot because of alleged discrepancies between the testimony at the trial and that given in the deposition taken February 3, 1963. It is Resso's contention that if this testimony were stricken, there would be no sufficient causal relationship between

the damage asserted and the alleged breach. This is not a situation where testimony was changed to meet the exigencies of the occasion. Here the discrepancies were satisfactorily explained and are accounted for by the fact that at the trial Schanot was testifying from the Wilson records made at the time of the transaction, and at the time of his deposition taken in Lincoln more than 3 years after the transaction he was testifying from memory. We find that the action of the trial court in overruling Resso's motion was proper, but even if Schanot's testimony on the questioned points was impeached or stricken, the testimony of Wilson's president and the records themselves are sufficient to sustain the judgment.

Resso argues that in order to warrant recovery, there must be a causal relation between his act and the damages sustained. Resso asserts that the verdict herein rests upon conjecture, surmise, or speculation, and cites extensively from Baer v. Schaap, 171 Neb. 347, 106 N. W. 2d 468, to sustain his position. That case and the cases quoted from therein are not in any way analogous to this one. Resso assumes a premise that there were "two or more possible causes of the injury." This premise has no foundation in fact. The evidence herein is conclusive that because of Resso's misrepresentations, the corn was purchased by Wilson and shipped in interstate commerce in the four cars which were condemned. The cars were condemned because of the presence of pink-colored corn containing Captan. There is no dispute the Resso corn was the only pink-colored corn handled by Wilson during the period in question. The acts and representations of Resso were the sole and only cause of Wilson's loss. A party is answerable for the natural, probable, reasonable, and proximate consequences of his act. See Driekosen v. Black, Sivalls & Bryson, Inc., 158 Neb. 531, 64 N. W. 2d 88.

Unless we ignore the fact that immediately after signing an agreement with Steckley not to resell the corn to anyone who would put it in the regular channels of

commerce where it might be used for feed, food, or oil purposes, Resso sold and delivered the corn to an elevator, we must hold that Resso deliberately misrepresented the nature and quality of the corn in wanton disregard of the consequences of his action. His answer and the stipulation admit a knowledge of the presence of Captan in the corn. The most charitable thing that may be said of his action is that he was guilty of negligence per se. When Resso was specifically asked if the corn was treated with anything poisonous he was under an obligation to make a full disclosure. One who knows or has reason to know that a certain food product is not fit or suitable for use in the ordinary channels of commerce and who sells it without disclosing its dangerous or noxious nature to a good faith purchaser is subject to liability to the purchaser for all damages the purchaser may sustain as a result of the introduction of the product in the ordinary channels of commerce. See Colvin v. Powell & Co., Inc., 163 Neb. 112, 77 N. W. 2d 900, a case in many respects similar to the instant one.

For the reasons given, the judgment of the trial court is affirmed.

AFFIRMED.