BJORN LINDELOW, APPELLEE, V. PETER KIEWIT SONS', INC.,
A CORPORATION, APPELLANT.
115 N. W. 2d 776

Filed June 15, 1962.   No. 35157.

(1)

Stoehr, Rickerson, Sodoro & Caporale, for appellant.

Seymour L. Smith and W. L. (Jim) Weber, for appellee.

Heard before CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

BROWER, J.

This is an action for damages for personal injuries brought by Bjorn Lindelow, plaintiff and appellee, against Peter Kiewit Sons', Inc., a corporation, defendant and appellant, in the district court for Douglas County, Nebraska. A trial was had before a jury. At the close of the plaintiff's case the defendant moved for a directed verdict. The court overruled the motion and the defendant rested without introducing any testimony. Thereupon, the case was submitted to the jury which returned a verdict for the plaintiff in the sum of $379,500, and judgment was rendered against the defendant in that amount.

The defendant filed a motion for judgment notwithstanding the verdict or in the alternative for a new trial and upon the overruling thereof has brought the case to this court on appeal.

The injuries which the plaintiff sustained were in-

curred when he dove from a dock on the premises maintained by the defendant. The dock was on a lake known as Kiewit Lake. It is located on an area in Cass County which is east of highway No. 75, three-quarters of a mile south of the Platte River and 3 miles west of the Missouri River. The lake itself was created about the year 1934 by dredging and the hole incident thereto filling with water from underground, and from rain, snow, and runoff. About 12 or 18 months after the area was dredged the banks were at least in part sloped and sand was added for bathing. The original work was done by Peter Kiewit Sons' Company, a separate corporation, which still has title to the land itself. Commencing in the year 1941, it was first maintained by Peter Kiewit Sons' Company but during the times mentioned herein by defendant for picnicking, boating, swimming, fishing, ice skating, softball, and horseshoes. Its use was restricted to the employees of both Peter Kiewit Sons' Company and the defendant Peter Kiewit Sons', Inc. It was maintained to facilitate better employee morale. No charges were made to the employees though on occasion charcoal was sold to them for fuel in preparing food. On the northerly side of this lake was a floating dock. It was a platform 8 by 12 feet in dimensions in the nature of a raft, covered with burlap or sacking and supported on the surface of the water by a bevy of 10 55-gallon common oil barrels. On the side of the raft towards the lake was a diving board which on comparison with the raft from photographs in evidence seems to extend half its length or 6 feet farther out toward the center of the lake. On the side towards the shore was a plank which served as an approach to the float and also tended to keep the raft in position. It was fastened to the raft and in turn to a wooden timber on the shore. Ropes ran from the two corners of the raft nearest the shore to a post and a tree, respectively, to keep it from moving to the right or left, though it could move somewhat either way as the

lake rose or fell or, to some extent, from the wind. If the lake rose the ropes were shortened and if it fell they were lengthened.

There was a caretaker and watchman employed by the defendant on the grounds whose name was John Thomas, who will hereafter be referred to as Thomas. He resided the year-round in a cottage near the lake. This caretaker was 72 years of age. He had served continuously as watchman and caretaker since 1939. His duties were to see that outsiders didn't get in and those entitled to enter could do so, to keep the grass and weeds cut and raked, and to destroy the leaves according to instructions given him originally by defendant's vice president. Thomas and the plaintiff, his wife, and child had known each other for several years.

On the Sunday morning of March 10, 1957, the plaintiff, then about 34 years of age and employed by the defendant as an estimator, with his wife and 10-year-old daughter, went to this area, taking their lunch. They arrived there shortly before noon. Thomas was then at church. There were two gates to the grounds, both of which were locked. They stopped at both gates and honked at the gate close to the caretaker's cabin. Getting no response, they climbed over and crawled under the gate. They had previously entered in this manner when the gate was locked. They went to a cabin which had an open fireplace where food could be cooked. It had a screened porch facing the lake. Thomas returned from church about 12:30 p.m. Noticing their car at the gate, he went to the cabin where they were eating and visited with them. Plaintiff said to Thomas he was sorry they drove all the way down and he wasn't there, and in his absence they decided to climb over the gate. Thomas answered that he was sorry he wasn't there because it was his job. Plaintiff then stated that if Thomas went to church it didn't matter, they got in anyway.

Plaintiff's wife asked the caretaker, "Do you think we are crazy to go swimming this early in the year?"

Thomas replied, "No, I don't. The premises are open here. The lake is here, you can go swimming any time you want to." Plaintiff told his wife that she had cheated him by having her bathing suit under her slacks while he had not brought his own. Thomas then informed the plaintiff that his swimming suit was in the change house; that plaintiff had forgotten it last fall; and that he knew it was the plaintiff's because he was the last to swim there. After this conversation Thomas left to prepare his lunch.

It was a warm day for March with the temperature about 70° at the time of the accident. The report of the United States Weather Bureau at Omaha that day showed a high of 71° and a low of 38°. When they finished their lunch the plaintiff and his wife changed into bathing suits. After sunning themselves on the beach for about an hour the wife stood up and hurried out to the lake and waded out until the water came to her waist and then swam in a semi-circle back approximately to the same point. While she was doing this the plaintiff, in what he says was a half run, went to the dock and, after watching his wife a short time, dove in at a point shown on a photograph taken of the dock about 3 feet from the southeasterly corner of the dock, which corner is toward the lake.

On being helped from the water after this one dive it was found that plaintiff was injured. An ambulance was called and he was taken to the hospital. It was there found that his injuries were very severe. Though they are not necessary to this opinion, it can be said that he suffered a comminuted fracture of the sixth cervical vertebra resulting in paralysis of the lower limbs and of any functions where the nerve roots leave the spinal cord below the sixth cervical vertebra. Plaintiff's condition is diagnosed as that of a quadriplegic, which is paralysis involving the four extremities, and in plaintiff's case included the loss of the normal control of his kidneys and bowel. The condition appears perma-

nent and he will always be confined to a life in a wheel-chair and a specially-made bed, with a device for lifting him from one to the other. He has had operations and extensive treatment of an expensive nature in the past which have necessitated great care, and he will require both treatment and care in the future.

The facts as set out above are of course ascertained from the evidence introduced by the plaintiff's own witnesses and are not in dispute. The rest of the evidence will be discussed as it appears pertinent to our decision. In those particulars where we find a variance we will note it as the plaintiff is entitled to receive every reasonable inference in view of the verdict of the jury.

The defendant makes 16 assignments of error, but in view of our ruling it will be necessary to discuss only the following: The trial court erred in holding that the evidence was sufficient to sustain the verdict; in not holding as a matter of law that the plaintiff was a licensee; in ruling that there was sufficient evidence of defendant's negligence for the jury to consider; in not ruling that the plaintiff was guilty of contributory negligence as a matter of law sufficient to bar recovery; in not holding that the plaintiff was guilty of assuming the risk as a matter of law sufficient to bar recovery; and in overruling defendant's motion for judgment notwithstanding the verdict.

In consideration of the case before us the first question to be deduced is the status of the plaintiff with respect to his presence on the premises where he was injured. That involves the question of whether the plaintiff was an invitee or a licensee thereon. The trial court evidently considered that under the evidence this was a question of fact to be determined by the jurors and submitted it to them for their decision. On this issue, as in all such questions, the rule is that before the evidence is submitted to the jury, there is a preliminary question for the judge, not whether there is literally no evidence but whether there is any evidence upon

which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed. Edgar v. Omaha Public Power Dist., 166 Neb. 452, 89 N. W. 2d 238.

The law with respect to invitees and licensees was discussed by this court in Malolepszy v. Central Market, 143 Neb. 356, 9 N. W. 2d 474, where this court stated: "This court has clearly defined the three terms as follows: 'The law places those who come upon the premises of another in three classes: Invitees are those who are expressly or impliedly invited, as a customer to a store; licensees are persons whose presence is not invited, but tolerated; trespassers are persons who are neither suffered nor invited to enter.' "

The case of Malolepszy v. Central Market, *supra,* cites certain portions of Restatement of the Law, on the question of licensees as distinguished from business invitees which, though applicable, are not deemed to exactly express the rules affecting the case before us as well as these from which we will now quote from the same work.

In Restatement, Torts, § 330, p. 893, the general rule defining a licensee is given as follows: "A licensee is a person who is privileged to enter or remain upon land by virtue of the possessor's consent, whether given by invitation or permission. * * *

"An invitation differs from a permission only in this: an invitation is conduct which justifies others in believing that the possessor desires them to enter; a permission is conduct justifying others in believing that the possessor is willing that they shall enter if they desire to do so. It is immaterial whether the consent which creates the license is an invitation originating with the possessor of the land or by a permission given upon request made by the licensee. The important fact is that the entry is by the consent of the possessor and it is immaterial that the suggestion of the visit originates with him or with his licensee." On page 894 of the

same section of that work it states: "A license may be given by any words, either written or spoken, which manifest consent."

"An 'invitee' is defined as a person who goes on the premises of another in answer to the express or implied invitation of the owner or occupant on the business of the owner or occupant or for their mutual advantage." 65 C. J. S., Negligence, § 43(1), p. 508. The same rule appears to be recognized in Restatement, Torts, § 332, p. 897.

The case of Kruntorad v. Chicago, R. I. & P. Ry. Co., 111 Neb. 753, 197 N. W. 611, is cited by the plaintiff herein and the language of the court is quoted wherein it said: "There is much confusion from the failure of courts to distinguish between a license and an invitation, and particularly between an implied license and an implied invitation. An invitation is inferred where there is a common interest or mutual advantage, or where an owner or occupant of premises, by acts or conduct, leads another to believe the premises, or something thereon, were intended to be used by such other person; that such use is not only acquiesced in by the owner or occupant, but is in accordance with the intention or design for which the way, place or thing was adapted or prepared or allowed to be used; while a license is implied where the object is the mere pleasure, convenience or benefit of the person enjoying the privilege."

Plaintiff argues that the wording of the quoted portion of the decision is applicable to the case before us and that the premises here involved were intended and designed for use as a recreation ground for plaintiff, including swimming, and it follows that the plaintiff was an invitee within the words quoted in that case. In the cited case the stairs in question were not constructed by the defendant railroad. They had no connection with its business but were adapted, prepared, and allowed to be used for the "mere pleasure, convenience, or benefit of the person enjoying the privilege." The holding in

the cited case we believe was clearly based on the fact that the injured plaintiff was using the stairway for his own affairs not connected with the defendant's business and not built by it or maintained with respect to its business.

In cases attempting to distinguish between licensees and invitees where there is an express invitation there is also confusion over the term invitation. In many instances where the court finds there was a license only it continues by further stating there was no invitation under circumstances that might lead one to suppose that wherever there is an invitation as a layman uses it in ordinary social affairs of life, the one receiving it becomes an invitee as the term is used in law.

The authorities cited and the cases clearly hold however that a license may result from an invitation making one a licensee or, on the other hand, may be such as to make one an invitee. The real difference is the purpose of the invitation. If the invitation relates to the business of the one who gives it or for the mutual advantage of both parties of a business nature, the party receiving it is an invitee. If it is an invitation for the convenience, pleasure, or benefit of the person enjoying the privilege it is only a license and the person receiving it is a licensee.

Many courts speak of those who receive invitations for matters not connected with business as social guests. They are however but licensees. The matter is discussed in 38 Am. Jur., Negligence, § 117, p. 778. It there states: "Although there is not a great deal of authority upon the point, the rule appears to be that the relation between host and guest is not that of invitor and invitee, but that of licensor and licensee, and that, in accord with the general principle which determines liability of an owner or occupant of premises to one who comes thereon as a mere licensee, the host is not liable for an injury sustained by the guest from some defect in the condition of the premises, except as the licensee is

needlessly exposed to peril through the failure of the owner or occupant to warn him of danger, or by the active negligence of the owner or occupant. There is no duty on the part of the host to reconstruct or improve the premises for the purpose of making his house more convenient or more safe for those accepting his hospitality, gratuitously extended. The guest assumes the ordinary risks which attach to the premises. No exception is made to the rule because of the fact that the guest enters on the host's express invitation to enjoy his hospitality. * * * However, the rule is that a host who knows of a concealed danger upon the premises is guilty of negligence if he permits the guest, unwarned of the peril, to come in contact therewith, and he may be held liable to the guest for an injury thus sustained."

Other courts speak of persons receiving invitations not connected with business as gratuitous licensees and the rule is the same as given in regard to social guests. Cases to this effect are cited in a note in 25 A. L. R. 2d 598; and in that annotation, § 4, p. 605, a general rule is stated in cases where invitation of a social guest did have incidental motives other than purely social as follows: "In most of the cases here considered the status of the plaintiff as a social guest has been conceded or assumed in the light of the uncontested facts. However, it is sometimes necessary to decide the preliminary issue of the plaintiff's status at the time of injury. It is clear that the fact that the visit during which the plaintiff was injured may have incidental motives other than purely social ones will not be sufficient to characterize the visitor as an 'invitee.' "

In Spence v. Polenski Bros., Schellak & Co., 110 Neb. 56, 193 N. W. 101, the court held: "Where a pond is formed on the premises of an owner as the natural consequence of removing clay for the manufacture of brick, and where an employee of the owner, a boy 16 years of age, during the noon hour, without the direction of the master, either express or implied, but with his knowl-

edge and consent, voluntarily goes swimming in the pond for his own pleasure, and not in furtherance of the master's business, and is drowned, such employee is a licensee, and the master owes no duty to him as long as no wanton or wilful injury is inflicted upon him by the master or his servants." In the cited case the court further stated: "It is a well-settled doctrine that, before the master can be held liable for an injury to his servant growing out of such relationship, it must appear that the servant was injured through the negligence of the master, and that at the time of the injury the servant was engaged in carrying out some part of the master's business, or going to or from the master's service along avenues provided by the master. The rule, however, does not extend to a situation where the servant at the time of the injury was acting outside of the scope of his employment, for his own purpose, without the direction of the master, either express or implied." It is true that there is general language in the cited case in which the court says that a knowledge or acquiescence on the owner's part does not amount to an invitation so as to impose upon the owner the obligation which he owes to an invited guest. The decision however was based upon the premise that the employee was at the time pursuing his own pleasure and that his presence on the premises had no connection with the employer's business.

It appears from an examination of the authorities that in order to be an invitee on the premises of another the invitation of the owner or occupant must be related with the business of the owner or occupant or to their mutual advantage.

In the case before us the defendant had sent letters to its employees, including the plaintiff, with respect to the use of the recreation grounds. Four of these are contained in the evidence. The first is dated July 31, 1953, and is directed "To All Home Office Employees." The letter explains it is for the benefit of new employees

and states the wish to outline the policies and rules of the company. Thereafter, it gives directions to enable them to reach the lake. It says further that it will be open for all employees on Saturdays and Sundays; that on those days because of the large number using the lake its use must be limited to married employees, husband, wife, and children, and single employees with one or two friends or relatives; and that the use of the grounds, Monday through Friday, must be reserved and tells who must be contacted to make the reservation so that the ones reserving it might invite friends. It then states that there were no arrangements for disposal of tin cans or bottles and that such items must be taken home and not thrown in the fireplace. All garbage, paper plates, napkins, cartons, and papers must be burned or carried off the premises. Lastly, if the cabin were used it must be swept and left orderly.

On May 7, 1954, another letter was sent which mentions the premises and the lake which is described as suitable for swimming, with sand beach, picnic tables, and outside fireplace. It gives the same instructions concerning those entitled to its use on days of the week, except it states that only three reservations may be made by one employee on Monday through Friday because of the great demand during the past years. The rules with respect to garbage and other refuse were repeated and the requirements somewhat enlarged upon, including a statement that the gate must be closed at all times and locked on leaving. The letter contains the following statement: *"If we are to continue to provide these facilities for your enjoyment, we must ask your wholehearted cooperation in observing the above. You are all welcome to use the lake and it is our hope that by limiting the reservations to three per employee, more of you will be able to enjoy its facilities this season."* (Emphasis supplied.) On May 9, 1955, another letter was sent in which it states: "Because of the great demand for Kiewit Lake and the limited number of days

during *the summer* that it is available, it has been necessary to revise our policy in regard to reservations." (Emphasis supplied.)

The reservation privilege was further restricted to two reservations a year and it provided that during that year only one reservation could be made at a time and that it had to be used before another was made. The use on Saturdays and Sundays was continued as restricted to the employees and their immediate families. The explanation of requirements for disposal of garbage and trash by the employees was repeated.

On July 5, 1956, another letter was sent in which it was said that as a result of heavy demands, it was more important than ever that all observe the rules governing the use of the lake, which rules were set out in detail.

The letters, which plaintiff's counsel treats as invitations making the plaintiff an invitee, appear to welcome the employees to make use of the premises but in none of them is any suggestion that they are urged to use them or that the use of the facilities is particularly sought or desired by the defendant. The employees' attendance at the area had nothing to do with their work. Certainly no immediate business benefit accrued to the defendant. The defendant maintained no control over those using the area except it sought to require them to take care of their own trash and garbage, and to close and lock the gates. The employees were warned that if the use of the area were to continue they must obey these requirements. The restrictions as to use were narrowed each year because of increased patronage. As we view the letters, coupled with all the evidence in the case, the plaintiff was granted the privilege to make use of the premises as a licensee and not as an invitee.

Neither is our opinion altered by the claims of the plaintiff that the consent to go upon the premises was of business value to the defendant. This is apparently the theory which the trial court considered raised a question of fact for the jury. Plaintiff's contention rests

largely on the testimony of Dr. William H. Thompson, a psychologist and professor at the University of Omaha, who had made a study of industrial psychology. He testified as an expert witness that the defendant's facility had some business value to the defendant because it built up the morale of the employees, discouraged dissatisfaction, and encouraged continuity of employment. We think if such value existed, which might well be, it was remote and intangible in nature and not one directly connected with a business purpose. Neither does the testimony that on occasion the caretaker sold charcoal to the employees to facilitate cooking lunch make the plaintiff an invitee. These sales were trifling and appear wholly as a convenience to the employees and certainly were not for commercial profit. They were not connected with swimming or diving and were not availed of by the plaintiff on this occasion, nor does the evidence show he ever bought any.

The contention of the plaintiff that the conversation between himself, his wife, and the caretaker Thomas made the plaintiff an invitee is not convincing. The letters from defendant all told the employees whom they might contact for further information concerning the use of the lake, and he was not the caretaker. The plaintiff himself testified that the caretaker's duties were understood by him to consist of caring for the trees and keeping people that did not work for the company away from the grounds; that he kept the premises in order as far as raking, cutting the grass around his home, and taking care of the house or cottage. Some of the letters from the defendant speak of the use of the premises mentioned during the "season" or "summer." Two of them were sent in July, the first reciting it was for the benefit of new employees. The other two were sent in May. Thomas, a witness for the plaintiff, testified that the swimming season for 1956 was from about May 1st to September 1st. There was no evidence to the contrary and the evidence as a whole indicates no one used

the lake for swimming in March or April, except the plaintiff on the occasion when he was injured. It seems clear that the plaintiff knew at the time of the conversation with Thomas that the lake had not been made ready for the usual swimming period. The question plaintiff's wife asked Thomas as to whether he thought they were "crazy" to go swimming at that season shows that they understood it was unusual. The reply of Thomas could only be construed as a further permission or license applicable to that time, and not as an invitation on behalf of the defendant with a business implication when it concerned only one employee. It was in furtherance only of the plaintiff's recreation, enjoyment, and pleasure.

We will now state the rules of law which we deem applicable in this case, both on the question of the status of the plaintiff as a licensee or invitee, which we have hitherto considered, and the other questions which will be discussed later.

In Edgar v. Omaha Public Power Dist., *supra,* this court stated:

" 'A motion for directed verdict or for judgment notwithstanding the verdict must, for the purpose of decision thereon, be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor, and to have the benefit of every inference that can reasonably be deduced from the evidence.' Crane v. Whitcomb, 160 Neb. 527, 70 N. W. 2d 496."

As stated in Fairmont Creamery Co. v. Thompson, 139 Neb. 677, 298 N. W. 551: "A mere scintilla of evidence is not enough to require the submission of an issue to the jury. The rule is well stated in Farr Co. v. Union P. R. Co., 106 Fed. (2d) 437, as follows: 'The rule is that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether

there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed.' ". See, also, Armer v. Omaha & C. B. St. Ry. Co., 153 Neb. 352, 44 N. W. 2d 640.

In Kohl v. Unkel, 163 Neb. 257, 79 N. W. 2d 405, this court held: "Where the facts adduced to sustain an issue are such that reasonable minds can draw but one conclusion therefrom, it is the duty of the court to decide the question, as a matter of law, rather than submit it to a jury for determination."

Also, in Leach v. Treber, 164 Neb. 419, 82 N. W. 2d 544, we held: "If, from undisputed evidence, different minds may not reasonably reach different conclusions or draw different inferences, the trial court should render judgment consistent with the facts. * * *

"As a general rule, a party calling a witness vouches for his credibility and is ordinarily bound by any evidence he gives which is not contradicted or shown to be unreliable by evidence which would justify the trier of facts in arriving at a different conclusion." See, also, Davis v. Dennert, 162 Neb. 65, 75 N. W. 2d 112.

Relating these rules to the evidence before us nothing appears from which it might reasonably be inferred that the plaintiff was an invitee upon the premises. The issue with respect to whether he was an invitee or a licensee should never have been submitted to the jury and the trial court erred in not finding as a matter of law that the plaintiff at the time of his injury was a licensee thereon.

The trial court, after submitting to the jury the question of whether the plaintiff was a licensee or an invitee, submitted the question of the defendant's negligence to the jury, in case it found he was an invitee, in the following particulars:

"1. In failing to furnish a place around and out from said dock of sufficient depth and in such condition so as to permit diving with safety.

"2. In failing to mark the depth of the water at or near said dock.

"3. In failing to warn its employees and particularly the plaintiff of the insufficiency of the depth of the water around and out from said dock for diving.

"4. In failing to determine whether or not the water was of sufficient depth to permit the plaintiff to dive with safety as he had done on prior occasions."

The plaintiff contends that even if the plaintiff was a licensee it was the duty of the defendant who maintained the premises to give notice of traps or concealed dangers to the plaintiff. Such a rule is set out in Malolepszy v. Central Market, *supra,* in which this court quoted from the previous case of Haley v. Deer, 135 Neb. 459, 282 N. W. 389, saying: "The duty of the owner toward an invitee is to exercise reasonable care to keep the premises in a safe condition, but a licensee takes the premises as he finds them, for the only duty of the occupier to a licensee is to give notice of traps or concealed dangers."

The plaintiff's claim of an entrapment or concealed danger is premised on evidence that the raft or dock had been moved since October 1956, and that the water at the dock was not as deep as it was in the fall when the plaintiff had last been swimming. The defendant on the other hand contends that under the circumstances shown by the evidence, the plaintiff assumed the risk involved when he dove as a matter of law, and that he was guilty of contributory negligence more than slight as a matter of law. Inasmuch as the evidence concerning these questions is the same, we will now discuss that which has not already been referred to with respect to these conflicting claims.

In regard to changing of the location of the dock the plaintiff himself testified that it was in the same position it had been in the fall. Thomas in his testimony said he was aware of no change although it did at times change on the rise and fall of the lake or from wind

within the limits of the ropes which held it in place. On the rise and fall of the lake which on occasion varied as much as 3 feet, he shortened or lengthened the ropes and that he had not done so since the swimming season of 1956, which was prior to September 1, and a considerable time before the plaintiff used the dock in October. He estimated the lake to be of average height at the time of plaintiff's injury. Pictures of the dock about the time of the accident show these ropes and there appears to be some slackness in one of them, though it does not appear very great. The plaintiff's wife did tesitfy that the dock had moved considerably and that it appeared to her to be 2 or 3 feet closer to the shore than in previous years. She had testified in a previous deposition that its position was not changed. Her testimony might have been of some probative value considering the fact that the jury might consider the evidence in the light most favorable to the plaintiff were it not for the fact that she further stated she had been in Sweden from June 1956, through October 1956, during which time her husband used the lake. Under such circumstances it would appear that she could have no knowledge of whether its position had changed since her husband used it in 1956. Plaintiff's wife testified that when she got to the plaintiff and got her elbows under his arms the water was only about to her waist or 3 feet deep, but the evidence shows he had been struggling in the water as she had been going to him and it is not shown whether or not this was the place at which he entered the water. She previously stated in a deposition that she had waded out until the water became quite high on her.

After the accident the plaintiff's wife pointed out the place near the dock from which her husband dove. She is shown in a photograph in evidence standing upon the dock and pointing to the place where he had stood. After the plaintiff's injury the sheriff was summoned, and he and Thomas with a fishing pole made soundings

about this spot and reached out 8 or 10 feet in the direction in which he dove, and they both estimated the depth of the water at that place was 5 feet. Within 2 or 3 days thereafter a boat which was usually on the lake, but at the time of plaintiff's injury had been taken away for painting, was brought back and Thomas made soundings with a rake for obstacles within a distance of 8 or 10 feet of the dock at the point where plaintiff dove. No obstacles which he might have struck were discovered and there is no evidence whatever that there were any obstacles in the vicinity. On the 12th and 13th of March 1957, Richard Lawrence Foster, employed by the defendant, made soundings on the lake. Stakes or hubs, as they were called, were placed on the lake bank every 25 feet on either side of it, 5 feet back from the waterline. Foster, with a helper, got in the boat and they sighted from one hub to the one on the other side of the lake. They dropped a weight on a rope with a tape twined about it every 10 feet for 50 feet out from either shore. He then made profiles showing the result of the work. Exhibit 15 is the profile of the line crossing the lake and passing through about the center of the dock and through the length of the diving board. On this line he testified his sounding made 20 feet from the hub on the shore was right in front of the raft. At that point the profile exhibit 15 shows the lake about 4 feet deep. This point however, from an examination of the photographs in evidence, must be 5 or 6 feet across the end and corner of the dock from the place where the plaintiff dove from the side of the raft. Going out from the front of the raft toward the end of the diving board the lake bottom drops rapidly and under the end of the diving board it is 7½ to 8 feet deep. Foster testified also from exhibit 5, a photograph of the dock, diving board, and the lake shore to the southwest thereof, taken by the sheriff on March 10, 1957, the day of the injury, that the weeds and vegetation came right down to the water's edge. An examina-

tion of this exhibit 5 clearly shows this to be true. It appears therefrom that the lake could have been no lower than the previous fall. There is certainly no evidence that the defendant or Thomas, the caretaker, knew of any difference in the location of the raft or the depth of the lake which they were under obligation to impart to a licensee.

Plaintiff cites a great number of cases where proprietors of bathing pools or resorts, to which the public is invited and admission is charged, were held liable for injuries to bathers. These are cases where the person injured had entered a pool or beach run for profit under circumstances where he was clearly a business invitee and generally negligence is quite clearly shown. They are not applicable to the case before us.

We are unable to find that negligence on the part of the defendant has been proved and negligence cannot be inferred from the accident. Nolan v. Young Men's Christian Assn., 123 Neb. 549, 243 N. W. 639.

Defendant assigns as error that the trial court should have ruled plaintiff assumed the risk in diving as he did as a matter of law. The plaintiff's testimony shows he was an expert diver. He has been diving since he was 7 or 8 years old. He learned to swim in Sweden when he was 6 years old. In Sweden he swam in lakes with gravel, dirt, or rock bottoms and had taken tests in long-distance swimming. The "Kandidat" medal had been awarded him. This was the next to the top medal of which there was a series of 6 graduating in excellence of performance. In one test he swam a mile and a half; in another under water for 40 yards. In diving he picked up plates at a depth of 15 feet. He picked up 8 of 9 plates when 6 was passing. Likewise he was given, and passed, tests requiring swimming with clothes one-half mile, including boots above the ankle. Life saving tests were given. Dives were made from 10 feet and 30 feet. In Sweden he swam in water with ice about him and at times where holes were cut in

the ice. He swam in the Baltic Sea at shores, on beaches, and amid rocks. Plaintiff was familiar with the danger of diving in shallow water. In strange places he checked the depth by looking in the water. In Sweden the water was clear and he could see a considerable distance in it.

Plaintiff had been an employee of defendant since September 1951, and lived in Omaha since September 1952. He had used the recreation area at Kiewit Lake frequently since the winter of 1952 to 1953, when he first went there on a picnic with friends. Since that time he had used the cabin at the premises between 25 and 30 times. He started swimming from the dock in the summer of 1953, and had last used it in October 1956. Plaintiff testified he had been swimming at the lake on his visits 23 to 27 times and used this dock every time from 3 to 5 or 6 times, and dove from the same place with the same kind of a dive two dozen times. Plaintiff estimates it would take 5½ feet of water to execute this dive, which he had been doing for more than 25 years. An expect, Rex Aubrey, who testified on behalf of the plaintiff in answer to a hypothetical question, stated it would take 6 to 8 feet of water to make this type of dive. There were never any signs showing the depth of the water and plaintiff had no conversations with Thomas concerning its depth.

The exact cause of the injury of plaintiff is not clearly shown. The testimony shows there was no object in the lake that he could have hit. There is some evidence by the plaintiff's wife, a nurse, and an uncle, who visited him at the hospital, that he had a mark on the top of his head. His uncle described it as a reddish-blue mark, a little to the front of center of the top of his head about the size of the end of a thumb. This is not corroborated by anything the doctor says he observed. The only notes the nurse was able to find in the hospital record indicated hot packs applied to the right side of the head. This is perhaps sufficient for the jury to conclude that the

defendant hit the bottom of the lake. The dive was from the dock at an angle of 30° towards the lake and 8 feet out in that direction from the dock. He entered the water at an angle of 45° with the surface of the lake.

He was an experienced swimmer and diver, thoroughly familiar with the premises involved. It seems impossible for him to have gone swimming and diving from this dock on so many occasions without understanding the nature of this dug lake; that it was fed by surface water and underground seepage; and that its depth was not always constant or its bed uniform. He went there on March 10, 1957, which, at least for swimming, is considered still winter in Nebraska. It was almost 2 months before others swam there. He was the last person there in the fall before and had left his swimming suit. The ropes on the stakes had been taken from the poles which the year before had marked off the area of 3-foot water for bathing. They had not been replaced. The conversation of the wife with Thomas indicates that all three knew it was unusual to swim at the lake at that time of year. After going to the dock and looking down at the water without being able to see the bottom, though he says he could see 4 feet into its depth, he, without any further steps to determine its depth at the time, dove into the lake without going to the front of the dock or upon the diving board. It is lamentable that the plaintiff was so seriously injured. Whether it takes 5½ feet of water to make the particular dive, or 6 to 8 feet, as testified by the expert Rex Aubrey, it plainly appears that the plaintiff before diving should have checked the depth of the water and the uniformity of the lake bed, and his memory of both from previous years. When with his knowledge of the premises and his experience in diving he dove without taking such precautions, he assumed the risk involved in the venture. McCullough v. Omaha Coliseum Corp., 144 Neb. 92, 12 N. W. 2d 639.

Having found no negligence attributable to the defendant and that the plaintiff assumed the risk of diving under the circumstances shown from the evidence, it becomes unnecessary to discuss whether or not the plaintiff was also barred from recovery because of contributory negligence on his part.

It follows that the motion of the defendant for judgment notwithstanding the verdict should have been sustained and the plaintiff's petition dismissed.

The judgment is reversed and the cause remanded with directions to enter judgment notwithstanding the verdict dismissing the plaintiff's petition.

REVERSED AND REMANDED WITH DIRECTIONS.

SIMMONS, C. J., participating on briefs.