**O. V. OLIVIER, Petitioner,**

v.

**William SNOWDEN et al., Respondents.**

**No. B–399.**

Supreme Court of Texas.

April 3, 1968.

Rehearing Denied May 1, 1968.

Orgain, Bell & Tucker, Cleve Bachman and Lawrence L. Germer, Beaumont, for petitioner.

Harry Burns, Houston, for respondent.

SMITH, Justice.

William Snowden sued O. V. Olivier to recover damages for personal injuries sustained by him on December 16, 1964. Snowden was an employee of a general contractor, M. L. Osborne, who was in charge of construction work on a bank building in Jefferson County. Olivier was a subcontractor employed to do the plastering work on the building. The accident occurred while Snowden was using a scaffold owned by Olivier. Snowden's position throughout has been that he was an invitee while occupying the Olivier scaffold, and that Olivier, on the theory that a custom of allowing mutual use of scaffolding, had a duty to furnish to all employees, including

the employees of the general contractor, a safe place to work. Snowden alleged negligence generally. Specifically, Snowden alleged that Olivier was negligent in "installing one inch thick boards on said scaffold," and in certain other specific acts and omissions.

The pertinent facts are these: Snowden was employed by Osborne, the general contractor in charge of construction work of the Merchants National Bank in Port Arthur, Texas. Olivier was the subcontractor for plastering work on the building. To aid in the performance of his work, Olivier erected a scaffold on the outside of the building. Osborne testified that Olivier's contract provided that all scaffolding was to be furnished by him. The scaffold involved in this accident was built by Olivier; Olivier's men supervised the building of the scaffold; the building of the scaffold consisted of placing boards on a steel frame. Olivier was under no duty to furnish scaffolds for the use of the employees of any other contractor. There is no testimony that Olivier was required to construct the scaffolds with boards of a particular thickness. There is evidence that boards of 1⅝ inch thickness were generally used. There is evidence that the board involved in Snowden's accident was 1 inch in thickness. Olivier testified that he contracted to do the "lathing and plaster" work. This simply means that the lathing is a wire mesh and the plaster is put on the wire mesh. Olivier testified that he also did some ceiling work, but was not performing this type of work at the time of the accident here involved. In regard to the scaffold, the evidence shows that it was put together as follows: A part of the scaffolding was rented by Olivier from the Saf-Way Scaffolding Company. The rented portion of the scaffold is a steel "frame work that's six-feet tall and about five-feet wide." Decking boards such as the one involved in this suit were placed upon the steel frame work. These boards, of different lengths and thicknesses, were secured by Olivier from lumber yards. The completed scaffold was put into use primarily by the Olivier employees. The scaffold was used by the men in the performance of the work Olivier had contracted to do. The outer boards upon the steel frames were also used at times as a storage place for plastering materials or as a support for the mortarboard used by the plasterers.

In regard to the use of scaffolding owned by one contractor by the employees of another contractor, it is undisputed that such usage prevails in construction work of the character involved here. It is undisputed that Olivier was under no contractual obligation to furnish his scaffolds to such workers. It is a fair deduction from all the evidence that each contractor had the right to remove his scaffolds from one part of the building to another without regard to the need of the scaffold by workmen employed by other contractors. Furthermore, Olivier had the right to remove his scaffolds from the premises immediately upon the fulfillment of his contract. Evidence was introduced showing that on the Merchants National Bank job it was the practice of "employees of one contractor using any scaffold that had been put up by another contractor." There is testimony that there is "no specific reason" for using another contractor's scaffold. "It's just a general practice * * * that if a craft has a scaffold up, regardless of what the craft is, there's no reason for another craft to come and build a scaffold in the same place that this scaffold is already built. [The particular scaffold involved was located on the outside of the building under construction.] And, therefore, we just work from one scaffold or the other. Whoever gets a scaffold up first everybody works on it." As to relative costs of performing contracts, there appears in the record the general statement that "[a]ssuming a scaffold had been put up on this particular job, * * * by a painting subcontractor," it would "cost more money to tear down the painting subcontractor's scaffold and erect a new scaffold." A witness, who was a foreman for Olivier at the time of the accident, but not in the employ of Olivier at the time of trial, testified that he was not a witness to

the accident, but was somewhere on the job at the time. This witness, on the question of the general custom of using scaffolds, testified as follows:

"Q Now Mr. Yentzen, on that Merchants National Bank job, in regard to the scaffolding that was put up by different contractors, what was done as to whether or not your employees occasionally used other scaffolding, that is scaffolding from other contractors or occasionally employees of other contractors used your scaffolding. Can you explain a little of that for us, please, sir?

"A You mean how much of other crafts' scaffold did we use and how much of ours did they use?

"Q Yes, sir. That's it. Just tell us how —what was done on that job in general, the way that was done.

"A Well, sir, it was typical I would say of most all of the jobs that we encounter. We did on occasion use some scaffolding equipment of Mr. Osborn's. Very, very limited amount. We did use some scaffold of our own that I had brick layers erect instead of theirs since we would need it after they had left. Of course the electricians, has always worked off of our scaffold. And the iron workers worked off of our scaffolds and painters.

"Q Is that something that's just understood among you craftsmen?

"A Yes, sir.

"Q Will you explain to the jury why that's done. Give us an example if you will, why it's done that way instead of tearing down and moving the scaffolding back and forth?

"A Well, sir, ceiling for an example, the ladder is erected to a channel iron frame to which the metal lath is tied to which the plaster is applied. Well, the electrician, just for an example, attaches his light boxes or light fixtures to our channel iron framework after it has been installed. And normally it wouldn't be practical for us to go in and erect a scaffold and iron the ceiling out and put up our metal framework and tear it down; and then let the electricians come in and erect whatever they require to install their electrical work; and then come back and replace our scaffold to finish the lathing and plastering.

"This just never seemed an economical approach."

The evidence is clear that Olivier did not object to this occasional use of his scaffold by employees of the general contractor. The evidence is equally clear and undisputed that Olivier and his employees did not have actual knowledge that Snowden was using the scaffold. There was no express permission given to use the scaffold belonging to Olivier. It is also undisputed that Snowden was using the scaffold at the time of the accident pursuant to a direct order of Osborne's foreman and not by order of Olivier or any of his workmen.

The case was tried to the court with the aid of a jury. The jury in answer to special issues found that a person of ordinary prudence in the exercise of ordinary care would not use a one inch thick board on the scaffold in question, and that the use of a one inch thick board was a proximate cause of Snowden's fall from the scaffold. The jury further found that Snowden did not assume the risk when he attempted to lower a 300 pound form while standing on the scaffold. The court entered judgment in favor of Snowden against Olivier for $10,239.00. The court awarded $6,736.65 of the award to Texas Employers Insurance Association, an intervenor claiming subrogation rights by virtue of discharging its liability under the terms of a workmen's compensation policy which had been issued to Osborne, the employer of Snowden. The Court of Civil Appeals affirmed. 416 S.W. 2d 584. We reverse the judgments of the trial court and the intermediate court, and render judgment that Snowden and Texas Employers Association take nothing.

Olivier filed motions for instructed verdict at the close of Snowden's evidence and

at the close of all of the evidence. He also filed a motion for judgment non obstante veredicto within the time and in the manner required by the rules of procedure. The motions asserted that as a matter of law there was no evidence of probative value that Snowden occupied the status of an invitee; Snowden was injured while occupying the status of licensee, and that the only duty which Olivier owed Snowden was the duty not to injure him wilfully, wantonly or through gross negligence. Olivier further contended that there was no evidence of probative value that he had reason to anticipate or foresee that the scaffold would be put to a use involving a much greater strain than that for which the scaffold was designed. These motions were overruled.

The principal question for determination is the legal status of Snowden. Was he an invitee in his use of the scaffold, or was he a licensee? Olivier has elected to present this ultimate issue to this Court through five points of error. The first three involve the question of the duty owed by the sucontractor, Olivier, to Snowden, an employee of Osborne, the general contractor. The court of civil appeals has held that Olivier "owed the duty to use reasonable care to see that the scaffold constructed by him was safe for plaintiff to use." The fourth point is that Olivier was entitled to the exclusive use and possession of his scaffolds. The court of civil appeals has held that "Olivier was not entitled to the exclusive use and possession of his scaffolds. * * * Plaintiff was rightfully using the scaffold as directed by his foreman [Osborne's, the general contractor's foreman]. Such use was necessary and proper in the prosecution of the business of his employer, Osborne." The fifth point is that the court of civil appeals erred in holding that Snowden was an invitee on the scaffold in question. The holdings of the court of civil appeals, in effect, classify Snowden, the employee of the general contractor, as a *business invitee* of the subcontractor, thus imposing upon Olivier the duty to keep the scaffold involved in a reasonably safe condition for Snowden's use.

We have found no Texas cases and have been cited to none which present a factual situation such as we have before us in this case. Since this is a case of first impression in this State, we have turned to other jurisdictions for guidance. We have found cases which announce the rule that a contractor's or subcontractor's employee using the equipment of another subcontractor engaged on the same general project is regarded as a mere licensee of the owner of the equipment, at least in the absence of a showing that its use by others worked in some way to the benefit of the owner. Accordingly, these courts have held that such an employee, injured by the defective condition of the equipment, was not entitled to recover against its owner for ordinary negligence in construction or maintenance. 32 A.L.R.2d 414. We have concluded that the facts bring the instant case within the orbit of the cases announcing the above rule.

The leading case is that of Arthur v. Standard Engineering Company, 89 U.S. App.D.C. 399, 193 F.2d 903, 32 A.L.R.2d 408 (1951). The facts there were very similar to the facts presented in the case at bar. In that case, the plaintiff was an employee of an electrical subcontractor and the defendant was a steamfitting contractor. The plaintiff, with permission, used a scaffold of defendant and was injured when a board broke. Proof of a custom of allowing mutual use of scaffolding was made, and it was shown that on the particular project involved, the defendant's electricians had used ladders owned by other electricians. The Court, after relating the facts, stated the question for decision to be:

> "The case turns, therefore, on the question whether an employee of a subcontractor is in the legal status of a licensee or that of an invitee when he uses, either by permission expressly given or implied from established custom, a scaffold erected by the employees of another subcontractor for their own use."

The Court stated that it was well settled that "an invitor owes his invitee the duty of furnishing him with reasonably safe premises or applicances," and that it was "equally well established that a licensor is not liable in damages for the injuries of a mere licensee, unless the injuries were the result of the licensor's active negligence." In holding against the contention that the plaintiff was an invitee, and against the contention that the defendant owed the plaintiff the duty of furnishing the invitee with a reasonably safe place to work, the Court said:

"The appellant says if any doubt existed whether he was a licensee or an invitee the question should have been submitted to the jury, * * * Unquestionably so, when the status depends upon issues of fact created by a contrariety of evidence. But here the facts essential to the determination of appellant's status are not in dispute, and whether they showed him to have been a licensee or an invitee was a legal question for the court.

"* * * The witnesses agreed that the steamfitters built the scaffold for their own use and permitted Arthur and the other electricians to use it. But the permission did not stamp him as an invitee. * * * 'A permission, whether express or implied, is not an invitation to enter or use, and establishes no higher relation than that of mere licensor and licensee.'

"* * *

"The true test under the mutual advantage theory is whether the owner of a scaffold or other appliance receives benefit or advantage from the permitted use by another of that particular piece of equipment. If so, the user is an invitee; if not, he is a licensee. As the court said in Larson v. Tri-City Electric Service Co., 7 Cir., 1943, 132 F.2d 693, 697, 'A license imputes permissive authority from one occupying a superior position. A licensee has no right to occupancy except by permission of one in authority * * *.' Here the Standard Engineering Company, being the owner of the scaffold, occupied a superior position with respect to it."

Another case which is persuasive is Brauner v. Leutz, 293 Ky. 406, 169 S.W.2d 4 (1943). This case was cited with approval in Arthur v. Standard Engineering Company, supra. The facts in Brauner v. Leutz were that Brauner was the painting contractor on a building project and Leutz had the contract to do the carpenter work. The carpenters had constructed a scaffold for their own use but granted the painters permission to use it. Brauner was injured when the scaffold collapsed. The court held that, "in order to create that relation [of invitor and invitee, * * *] the invitee must go upon and appropriate the premises or the facilities of the invitor by and through which some benefit is received by the latter. In other words, the mission of the invitee should be for the mutual benefit of both parties."

The court went on to hold that Leutz was a licensor and not an invitor and that "[t]he doctrine appears to be universal that a licensor owes no duty to a licensee to provide safe places or premises for the occupancy or use of his licensee, save and except to abstain from doing any intentional, wilful (and in some jurisdictions gross reckless) act endangering the safety of the licensee."

Likewise, in the case of Munson v. Vane-Stecker Co., 347 Mich. 377, 79 N.W.2d 855, wherein there was a similar question to the one involved here, the Court said:

"* * * The test to be applied in a case of this character in determining whether a plaintiff was a licensee or an invitee is whether there existed mutual interests and mutual advantages to the parties concerned from the use of the equipment belonging to one party and left for use by another in the carrying on of a project in which both were interested."

The Restatement of Torts, classifies such a situation as we have here as being com-

parable to a loan of chattels. Restatement, Second Torts §§ 388–392. The case of Lampe v. Magoulakis et al., 159 Ohio St. 72, 111 N.E.2d 7, 10 (1953) holds that:

> "The law is well settled that, ordinarily, one is not liable for injuries resulting from the defective condition of a chattel loaned to another, where the one loaning the chattel did not in fact know of the defective condition, whether he ought to have known of it or not, and such one is under no duty to examine the condition of the chattel before lending it. 6 American Jurisprudence, 308, Section 193; annotations, 12 A.L.R. 774, 793, 61 A.L.R. 1336, 1338, and 131 A.L.R. 845, 855."

Olivier, in fact, did not know of the defective condition of the board. After the accident, it was discovered that the board had broken at a place where there was a knot. The comment under Section 392 of the Restatement also makes it clear that before liability of a person who supplies a chattel can attach, under these circumstances, there must be evidence showing that the use of the chattel is one in which the supplier has a business interest.

■ Whether we conclude that the factual situation in the present case establishes only that Snowden had implied permission to use the scaffold, or whether we view the facts as establishing a relationship between Olivier and Snowden as that of lender and borrower of a chattel, the result is the same. Our analysis of the facts leads to the conclusion that in no event can Olivier be compelled to respond to Snowden in damages. The facts essential to the determination of Snowden's status are not in dispute. Therefore, whether the facts showed Snowden to have been an invitee or a licensee was a legal question for the Court. Young Men's Shop v. Odend'Hal, 73 App.D.C. 354, 121 F.2d 857 (1941). In the present case all witness agreed that Olivier erected the scaffold for his own use and permitted Snowden and others to use it. The evidence shows at most that Snowden was using and occupying the scaffold by acquiescence and not by invitation. Permission is not sufficient to turn the scale in favor of Snowden's status being that of an invitee. " * * * A permission, whether express or implied, is not an invitation to enter or use, and establishes no higher relation than that of mere licensor and licensee." Branan v. Wimsatt, 54 App.D.C. 374, 298 F. 833 (1924).

Furthermore, the facts here do not meet the true test under the mutual advantage theory. We cannot agree with the theory that the *mutual use* of scaffolds as described here inured to the benefit of Olivier merely because such use of scaffolds would result in saving the extra cost of tearing down another contractor's scaffold and erecting one in its place. Reciprocal use of different pieces of equipment owned by different contractors simply shows the custom in operation. Prosser on Torts (3rd Ed.) at page 396, says: "the 'business' on which the visitor comes must be one of at least potential pecuniary profit to the possessor." We have examined the entire statement of facts as well as the facts recited in the briefs of the parties and find no evidence which shows anything other than that Snowden's use of the scaffold was in response to the order of Osborne's foreman. There is no evidence that the work which Snowden was performing resulted in any pecuniary benefit to Olivier. In the last analysis, we have a case where the use of the scaffold was not induced by the custom of contractors to use each other's equipment, but was used in response to the order of the foreman of the general contractor. Under this record it was the duty of Osborne to inspect the scaffold before ordering Snowden to enter thereon. Snowden's entry upon the scaffold was for the sole benefit of the general contractor, Osborne.

> "In the absence of some relation which inures to the mutual benefit of the two, or to that of the owner, no invitation can be implied, and the injured person must be regarded as a mere licensee." Cowart v. Meeks, 131 Tex. 36, 111 S.W.2d 1105 (1938).

In the case of Burton Construction and Shipbuilding Company v. Broussard, 154 Tex. 50, 273 S.W.2d 598 (1954), we held under the facts of that case that:

"[t]here existed no element of mutual benefit accruing by virtue of respondent's [Broussard's] visit to the shipyard on the morning of the explosion."

In the case of Scalise v. F. M. Venzie & Co., 301 Pa. 315, 152 A. 90 (1930), a plastering subcontractor was held liable for the death of an employee of another subcontractor who fell from a scaffold owned by the plastering subcontractor because of its defective construction. The holding of liability rested upon the fact that the agreement between the plastering subcontractor and the general contractor provided for compensation to the plastering subcontractor when his scaffolds were being used by a subcontractor for decoration. Under such circumstances, the court held that the plastering subcontractor owed the duty of reasonable care. See also, Meny v. Carlson, 6 N.J. 82, 77 A.2d 245, 22 A.L.R.2d 1160 (1950).

There are two New York cases which appear to express a contrary view to that followed here: Quigley v. Thatcher, 207 N.Y. 66, 100 N.E. 596 (1912), and McGlone v. William Angus, Inc., 248 N.Y. 197, 161 N.E. 469, 470 (1928). However, these cases are distinguishable from the present case. In Arthur v. Standard Engineering Company, supra, these cases were discussed. As heretofore indicated, apparently an opposite result was reached than that in *Arthur* and *Brauner,* supra. However, the cases are not only factually different, but as pointed out in *Arthur,* the court in the New York opinions did not employ the "mutual advantage" test, and did not consider the question of whether the injured workman's status was that of a licensee or that of an invitee. We are not passing on a case where, as in *Quigley,* the defendants were general contractors. In *Quigley,* plaintiff was an employee of a subcontractor. The defendants had erected the scaffold upon which plaintiff was walking when the plank gave way, and he was injured. There was no other appropriate way for plaintiff to reach the place of his labors except over the defendants' scaffold. Under these facts, the court, after quoting a section of the Labor Law of New York which provided in effect that persons employing or directing another in the erecting, repairing, etc. of a house or building shall provide scaffolding adequately constructed to give proper protection to the "life and limb of a person so employed or engaged," held:

" * * * we think that when a contractor constructs and so locates a scaffold or platform that his subcontractor must of necessity or under the requirements of reasonable convenience in the performance of his work use the same the contractor may be held to have anticipated such use, and to have assumed liability to such subcontractor and his employés for the safety thereof."

The court further held that the jury was justified in finding that the scaffold or platform constructed by the defendants was so situated from the entrance to the building under construction to the place where "plaintiff's work called him that there was no other reasonable way to proceed than over it." * * *

"In such a situation we think that the defendants could be held to have foreseen or have been obliged to foresee that their structure would be used as plaintiff was using it at the time of his accident, and that they, doing nothing to prevent this use, were bound to comply with the requirements of the statute in keeping it in proper condition for his use. It is not necessary to consider whether a contractor might on this theory be made liable for the safety of a scaffold when subjected by a subcontractor to a use involving a much greater strain than that for which the scaffold was designed, for no such feature is present in this case."

In *McGlone,* where the facts were similar to those in *Quigley,* except the scaffold was

erected by another subcontractor and not by a general contractor, the court held that such subcontractor was under a duty to use reasonable care to construct it so it would be safe for those who would naturally and customarily use it in the course of their work. It should be noted that in neither of these New York opinions did the court bring into play the "mutual advantage" test. The "mutual advantage" test was declared by the Supreme Court of the United States in the case of Bennett v. Louisville & N. Railroad Co., 102 U.S. 577, 584–585, 526 L. Ed. 235 (1880) to be:

"The principle * * * appears to be that invitation is inferred where there is a common interest or mutual advantage, while a license is inferred where the object is the mere pleasure or benefit of the person using it."

Snowden contends that, as an employee of the general contractor, Osborne, he occupied the status of an invitee and that the duty owed to him is governed by the rule announced by this Court in Smith v. Henger, 148 Tex. 456, 226 S.W.2d 425, 20 A.L.R.2d 853 (1950) and in Hernandez v. Heldenfels, 374 S.W.2d 196 (Tex.Sup.1964). We hold that these cases have no application here. In Smith v. Henger, supra, a general contractor, was charged with "the legal duty * * * to use reasonable care to furnish a safe place to work for the employees of other contractors performing work on the job." The Court applied the law applicable to the owner or occupant of land and held that "a general contractor on a construction job, who is in control of the premises, is burdened with the duty to use due care to provide a safe place for workmen on the premises, including the employees of other contractors," citing authorities. In Hernandez v. Heldenfels, supra, we announced the rule that one of the controlling facts "in cases such as this is the nature of the contractor's possession." In Smith v. Henger, supra, the Court was concerned with the question of the duty owed by a general contractor to the employee of a subcontractor. In the present case, we have a factual situation where an employee of the general contractor was using equipment owned by the subcontractor. The true test to be applied in the present case is whether the owner of a scaffold or other appliances receives benefit or advantage from the permitted use by another of that particular piece of equipment, in this case a scaffold. Here, as in Arthur v. Standard Engineering Company, supra, Olivier, the owner of the scaffold, has received no benefit or advantage from the permitted use of the scaffold.

The judgments of both the trial court and the court of civil appeals are reversed, and judgment is here rendered that the plaintiff, Snowden, and the intervenor, Texas Employers Insurance Association, take nothing.

GREENHILL, Justice (dissenting).

I cannot agree with the conclusion of the Court that as a matter of law the plaintiff Snowden was not an invitee on the scaffold of defendant Olivier at the time of the accident. The testimony establishes that the various contractors and their employees used each other's scaffolds whenever useful; and that this custom, practice and understanding was followed on this particular job as well as in the local construction industry in general. Although the evidence indicates that defendant Olivier was not responsible for furnishing scaffolds for employees of other contractors, it is undisputed that he did not object to the use of his scaffolding by such other employees, and that Olivier's employees used the scaffolding of other contractors whenever necessary or useful.

Further the testimony conclusively establishes that the custom or practice of the reciprocal use of scaffolds was followed because it was mutually advantageous and beneficial to each contractor on a particular job. The various contractors benefited from the reciprocal use of each other's scaffolds by saving the time and expense of erecting their own scaffolds when an existing scaffold would serve the purpose. Otherwise, as the record indicates, a contractor

might be forced to tear down an existing scaffold and erect a new one in the same place; thus the reciprocal use of scaffolds was practical and economical. It is also established that defendant Olivier acquiesced in this custom and practice, and it may reasonably be inferred that he benefited thereby; he testified himself that there were occasions when he and his men used the scaffolds of other contractors. There is no explanation in the record for defendant Olivier's acquiescence in the practice of sharing scaffolds; except that this custom and practice was mutually beneficial to all concerned and in the mutual interest of all the contractors on a job.

The statement in the Court's opinion that "there is no evidence that Snowden's use of the scaffold was for the benefit of Olivier" ignores the basis for the custom among contractors of permitting each other's employees the use of scaffolds erected by each other. That custom is based on sound business reasons—thus, it is of benefit to each contractor to follow the custom in connection with the construction of a particular building. The consent or implied invitation under these circumstances would be given for business reasons and not merely to accommodate the other contractor or his employees who use the scaffold. "An invitation is inferred when there is a common interest or mutual advantage, while a license is inferred when the object is the mere benefit or pleasure of the person using it." Galveston Oil Co. v. Morton, 70 Tex. 400, 7 S. W. 756 (1888). If the purpose of the implied invitation was for business reasons, the economic benefit need not be direct or certain, so long as there is a mutual interest or business reason involved. Lindelow v. Peter Kiewit Sons', Inc., 174 Neb. 1, 115 N.W.2d 776 (1962); Findley v. Lipsitz, 106 Ga.App. 24, 126 S.E.2d 299 (1962); Dotson v. Haddock, 46 Wash.2d 52, 278 P.2d 338 (1955); see Annotation, 95 A.L.R.2d 992 (1964).

Since Olivier acquiesced or permitted the use of his scaffold for business reasons, there was, in my opinion, an implied invitation rather than a license, since such acquiescence would be to Olivier's advantage and in the mutual interest of the contractors on the job. As stated, the majority's statement that "the evidence shows at most that Snowden was using and occupying the scaffold by acquiescence and not by invitation" ignores the evidence that the custom of sharing scaffolds was mutually advantageous. Thus an implied invitation should be inferred because the acquiescence or permission was given for business reasons, indirectly beneficial to defendant Olivier.

Arthur v. Standard Engineering Co., 89 U.S.App.D.C. 399, 193 F.2d 903, 32 A.L.R.2d 408 (1951) cited by the Court is in point; but, in my opinion, it is wrongly decided and should not be followed. In Brauner v. Leutz, 293 Ky. 406, 169 S.W.2d 4 (1943), there was apparently no evidence of mutual advantage or interest, since it was unmentioned by the Court. In the instant case, there was evidence that defendant Olivier acquiesced in the custom of sharing his scaffold for business reasons to his own indirect advantage, and not merely to accommodate or benefit plaintiff Snowden. There is no Texas case either way; and under these circumstances, the sounder rule would be that this is evidence of an implied invitation and at least an indirect benefit sufficient to make the plaintiff an invitee.

When it is shown that it is the custom of workmen of different crafts or employers to use the scaffolds of the other on this or the next job, it would appear sound to me to require that the scaffolds be constructed in a reasonably safe manner for all workers who might reasonably be foreseen as using them and in a manner which was ordinary. The jury acquitted the plaintiff of contributory negligence and assumed risk, and no point is presented to us on either of those issues. The defendant had points in the Court of Civil Appeals that the evidence to support these issues was insufficient. They were overruled.

I would affirm the judgments of the trial court and the Court of Civil Appeals.

CALVERT, C. J., STEAKLEY and POPE, JJ., join in this dissent.